In the Matter of a Motion to Compel
Arbitration between
**HELLENIC LINES, LTD.,** Petitioner-
Appellee,
and
**LOUIS DREYFUS CORPORATION,**
Respondent-Appellant.

No. 309, Docket 30571.

United States Court of Appeals
Second Circuit.

Argued Jan. 17, 1967.

Decided Feb. 10, 1967.

David I. Gilchrist, New York City (Hill, Betts, Yamaoka, Freehill & Longcope, New York City, on the brief), for respondent-appellant.

Nicholas J. Healy, Jr., New York City (Healy & Baillie, New York City, Raymond A. Connell, East Rockaway, N. J., on the brief), for petitioner-appellee.

Before MEDINA, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This is a petition under 9 U.S.C. § 4 by Hellenic Lines, Ltd. against Louis Dreyfus Corporation to compel arbitration of a commercial dispute. Dreyfus admitted in its answer the execution of an agreement to arbitrate but pleaded that the agreement was procured by duress and was therefore invalid. Hellenic denied duress and also argued that, in any event, Dreyfus had waived this defense by its conduct. A hearing on these issues was held in the Southern District of New York before Judge Tyler, who concluded that Dreyfus had not established duress. 249 F.Supp. 526 (S.D.N.Y.1966). Accordingly, Judge Tyler granted the petition to compel arbitration. From this order, Dreyfus has appealed to this court —as it may, although at first glance the order under attack hardly seems "final." Chatham Shipping Co. v. Fertex S.S. Corp., 352 F.2d 291, 294 (2d Cir. 1965). For the reasons set forth below, we affirm.

The facts are relatively simple. On November 9, 1964, Hellenic contracted with the Iranian Economic Mission to load, at Hellenic's expense, approximately 5,000 tons of wheat at a grain elevator in Baltimore, Maryland and transport it to Iran. Dreyfus was not a party to this freight engagement. However, on the same day, Dreyfus had contracted to sell the wheat in question to the Iranian Mission. Dreyfus had a dual capacity in the transaction; it sold the grain and it operated the grain elevator where the wheat would be loaded on a vessel. Hellenic was not a party to this contract of sale.

However, Dreyfus and Hellenic were not strangers to each other; Dreyfus had been trying for some time to collect elevator charges billed to Hellenic a few years before in connection with the loading of a Hellenic vessel. Therefore, when Dreyfus learned that another Hellenic vessel, the S.S. Hellenic Star, would be loading the grain, fairly predictable events followed. First, Dreyfus notified Hellenic that it would require prepayment of loading charges. This request, in the words of the district judge, "triggered a series of irascible telephone conversations and correspondence between * * * [Hellenic] and Dreyfus * *. Nevertheless, several days later Hellenic sent its check of $24,096 in partial com-

pliance with Dreyfus' demand." The S.S. Hellenic Star arrived at the grain elevator on December 2, but was not assigned a berth until December 6. Hellenic protested this detention because it was causing the vessel to miss commitments at other ports. On December 8, Dreyfus informed Hellenic that the sums already deposited did not cover overtime expenses in loading the vessel and asked for further prepayment. A further dispute arose as to who was causing the delay in loading and consequent overtime and other expenses. Hellenic, among other things, pointed out that it had a claim against the Iranian Mission because the wheat had not been bagged in advance. Finally, in response to a demand by Dreyfus that the ship accept overtime or get out, Hellenic under protest paid Dreyfus another $10,000 for the estimated costs of overtime. As is apparent from the foregoing, Dreyfus at this time had the upper hand in its dealings with Hellenic; the latter had a contract obligation to the Iranian Mission to deliver the wheat and was concerned about who would bear the extra loading costs. Therefore, Hellenic kept the Mission's agent in this country fully informed of the dispute. Finally, in this charged atmosphere,[1] Hellenic's ship left berth on December 15.

At this point the situation changed; Dreyfus, wearing its other hat as seller of the grain, was obliged to furnish a "clean" bill of lading against the letter of credit opened in its favor by the Iranian Mission. However, what was tendered to it by Hellenic was a bill of lading with the following legend thereon:

> 503 (FIVE HUNDRED AND THREE) BAGS SHORTSHIPPED. BAGS FRAIL CONTENTS OF SEVERAL BAGS SPILLING WHILE LOADED. NOT RESPONSIBLE FOR SPILLAGE OF CONTENTS. DETENTION IN LOADING DUE IN THE AMOUNT OF $10,653.12 AS PER ATTACHED STATEMENT.

> AMOUNT REFUNDABLE TO HELLENIC LINES LIMITED FOR OVERTIME AS DEMANDED AND PAID $10,000.00 ALSO OVERPAYMENT OF STEVEDORING $515.05. ALL OTHER TERMS AND CONDITIONS OF FREIGHT ENGAGEMENT NO 4575 OF NOV. 9, 1964 TO APPLY.

Hellenic claims—and Dreyfus denies—that placing this information on the bill of lading was necessary to protect its rights against the cargo. At the time, Dreyfus objected strenuously to the notations, particularly the items of $10,653.12 detention damages and overpayment of overtime and stevedoring of $10,000 and $515.05, respectively. Some urgent correspondence and negotiation followed, resulting in a settlement of the dispute. As to certain of the items, e. g., the alleged shortage and condition of the bags, Dreyfus agreed to pay Hellenic "any amount which * * * [Hellenic] may be called upon to pay to the receivers of this parcel by reason of not having inserted these remarks in the Bill of Lading." As to the items of $10,653.12, $10,000, and $515.05, in return for their deletion from the bill of lading, Dreyfus agreed by letter of December 24, as follows:

> In consideration of your making these deletions, we agree to submit your claims to arbitration in New York and, to that effect, we nominate as our Arbitrator Mr. Charles Nisi. Please nominate your Arbitrator so that the two may appoint an Umpire.

> We agree to pay any detention and any refunds of overtime and/or stevedoring charges which the Arbitrators may decide you are entitled to receive.

Thereafter, a clean bill of lading was issued, the wheat was delivered, and Dreyfus collected the substantial sums due it from the Iranian Mission.

■ Having obtained an agreement to arbitrate, Hellenic immediately took steps to pursue its remedy; on December 30, 1964, it appointed its arbitrator. Each

1. In contemporaneous correspondence, Hellenic characterized Dreyfus's conduct as "ruthless" and the transaction as "lamentable."

party had thus nominated an arbitrator, and these two agreed upon a third. On February 2, 1965, the attorneys for both parties were notified by one of the arbitrators that the panel was complete. Thereafter, the attorneys discussed a convenient date for the first arbitration hearing and conferred on a "submission" agreement. It soon became apparent that there was disagreement over the meaning of the December 24 letter agreement to arbitrate. While the extent of the disagreement is unclear, the attorney for Dreyfus phrased it as follows in a proposed submission agreement:

> It is the position of Hellenic that Exhibit B [the December 24 letter] constitutes an undertaking on the part of Dreyfus to be responsible for the obligations of the Iranian Economic Mission pursuant to its freight engagement with Hellenic Lines dated November 9, 1964. It is the position of Dreyfus that the letter of December 24th does not constitute such an undertaking and that the said letter is simply an undertaking to arbitrate the claims of Hellenic and Dreyfus' position as operator of the Port Covington Grain Elevator, Baltimore, Maryland.

> The parties are agreed that the panel should dispose of this preliminary question before proceeding to the merits of the Hellenc claims.

It should be noted that this draft made no mention of a claim of duress. This further controversy over the scope of the December 24 letter caused postponement of the first scheduled hearing from March 2, 1965 to March 11, 1965. Meanwhile, Dreyfus's attorneys submitted another draft of a submission agreement, which did specifically raise the issue of duress. After an abortive hearing before the arbitrators, this action to compel arbitration was begun.

Dreyfus claims that the agreement to arbitrate should not be enforced because it was obtained through duress. The district judge held that a factually supported defense of duress would be legally sufficient to defeat arbitration under the United States Arbitration Act (the "Act"). Section 2 of the Act requires enforcement of an agreement to arbitrate "save upon such grounds as exist at law or in equity for the revocation of any contract." This court has said that duress in the inducement of an arbitration agreement is a proper ground for revocation under the Act. World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362, 364 (2d Cir. 1965) (dictum); see Kentucky River Mills v. Jackson, 206 F.2d 111, 120, 47 A.L.R.2d 1331 (6th Cir.) (dictum), cert. denied, 346 U.S. 887, 74 S.Ct. 144, 98 L.Ed. 392 (1953). Moreover, whether state or federal law be deemed controlling makes no practical difference in this case;[2] we have found no distinction between them in defining or applying the venerable principles of duress which would require a choice between federal or state cases here. See United States v. Bethlehem Steel Corp., 315 U.S. 289, 299–300, 62 S.Ct. 581, 86 L.Ed. 855 (1942).

■ The early concept of duress had its roots in criminal and tort law as another sanction to control anti-social behavior that amounted to an assault on the person. The doctrine has changed and broadened over the years. For a while, it was said that the proscribed con-

---

2. The question of whether federal or state law determines the validity of arbitration clauses in contracts otherwise subject to state law when 9 U.S.C. is invoked is now before the Supreme Court. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 385 U.S. 897, 87 S.Ct. 202, 17 L.Ed.2d 130, granting cert. in 360 F.2d 315 (2d Cir. 1966); see id., 35 U.S.L. Week 3136, 3137 (questions presented). We have held that federal law controls. Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 404–409 (2d Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); cf. Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (contract not in maritime transaction or commerce). Whether the underlying transactions involved here would be subject to state law is questionable. See Gilmore & Black, Admiralty §§ 1–10, 1–17, 1–18 (1957).

duct had to throw fear into a man of "ordinary firmness" to amount to duress;[3] now it may be enough if the complaining party actually is coerced, whether he be brave or timorous.[4] It has also been pointed out that even a threat to do an otherwise lawful act may amount to duress under certain circumstances. See Hale, Bargaining, Duress, and Economic Activity, 43 Colum.L.Rev. 603, 618–21 (1943). Definitions of duress abound in the cases and literature. Thus, Restatement, Contracts § 492 (1932), characterizes duress as

> (a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or
>
> (b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement.

In United States v. Bethlehem Steel Corp., supra, Mr. Justice Frankfurter, in a dissenting opinion, stated (315 U.S. at 326, 62 S.Ct. at 599):

> These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a "bargain" in which one party has unjustly taken advantage of the economic necessities of the other.[5]

See also Oleet v. Pennsylvania Exchange Bank, 285 App.Div. 411, 414–415, 137 N.Y.S.2d 779, 783 (1st Dep't 1955) (Breitel, J.); Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 245 F.Supp. 889, 894 (N.D.Ill.1965); Dawson, Economic Duress—An Essay in Perspective, 45 Mich.L.Rev. 253, 289 (1947).

However duress may be defined, a key element today is the state of mind of the person threatened. This is not to say that the existence of choice necessarily disproves the existence of duress. In Union Pac. R. R. v. Public Serv. Comm'n, 248 U.S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131 (1918), Mr. Justice Holmes pointed out that:

> It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.

The question is one of degree. "As a practical matter it is obvious that there is no line of absolute demarcation between fear that deprives a person of free will and judgment, and lesser degrees of fear * * *." See Restatement, Contracts § 492, comment e (1932). Moreover, the nature and extent of the pressure "is inseparable from the subject. The pressure must be improper and excessive in going beyond what is reasonable under the circumstances in order to constitute either duress or undue influence." Ibid. Although it is not difficult to cite cases where extreme economic pressure was held not to be duress,[6] we

---

3.  E. g., Brown v. Pierce, 74 U.S. (7 Wall.) 205, 214, 19 L.Ed. 134 (1869).

4.  Restatement, Contracts § 492, comment a (1932).

5.  Although the majority failed to find duress (while the dissent did), it did not specifically disagree with the definition quoted above. The majority did state that "The word duress implies feebleness on one side, overpowering strength on the other." 315 U.S. at 300, 62 S.Ct. at 587.

6.  E. g., Hartsville Oil Mill v. United States, 271 U.S. 43, 46 S.Ct. 389, 70 L. Ed. 822 (1926) (threat of Government to breach contract unless plaintiff agreed to new contract within one hour was not duress) ; see Alloy Products Corp. v. United States, 302 F.2d 528, 531, 157 Ct.Cl. 376 (1962) ("even threatened financial disaster is not sufficient").

need not determine whether the limits of the doctrine are so narrow. A finding of duress at least must reflect a conviction that one party to a transaction has been so improperly imposed upon by the other that a court should intervene. After carefully reviewing the record, we have no such conviction here.

We turn again to the facts of this case. It is quite clear that at no time did Dreyfus exhibit the loss of judgment or severe impairment of bargaining power required to establish duress. Dreyfus, whose annual volume at the time was in the vicinity of $700 to $800 million, had the problem of satisfying the conditions of a letter of credit in order to obtain payment of $378,573. The claims raised by Hellenic amounted to slightly over $21,000. It is difficult to believe that Dreyfus could not have made some arrangement to obtain an amended letter of credit to cover a claim amounting to less than six per cent of the sum due from the Iranian Mission. In addition, Dreyfus had plainly not lost capacity to exercise its judgment. Thus, at the evidentiary hearing before Judge Tyler, one of Dreyfus's vice-presidents, addressing himself to the dispute as to the meaning of the agreement to arbitrate, testified:

> Secondly, as far as any letter is concerned, we had no idea that we were in any way discussing anything other than the specific items mentioned on the bill of lading and we would never have signed any such letter if there was any other thought in anybody's mind.

This description of the state of mind of a key Dreyfus executive is simply inconsistent with the notion that Dreyfus had no effective freedom of choice. It is evident that Dreyfus merely exercised its business judgment in a difficult situation. It had started a squabble under auspicious circumstances, but had to continue with it when the situation had changed. Dreyfus undoubtedly noted—as do we—that although the tables had been turned, Hellenic was not demanding immediate repayment but only a promise to arbitrate, hardly a shocking request. Finally, we regard as significant the taking by Dreyfus of preliminary steps to prepare for the arbitration, the two-month delay in claiming duress, and its sudden emergence only after a dispute as to the scope of the arbitration agreement. We need not hold that this conduct amounted to waiver—although indeed it might. We note only that a prompt disclaimer would have been more consistent with the state of mind Dreyfus now professes to have had, i. e., that the cup of arbitration was pressed upon it and it could resist no more. Under all these circumstances, we agree with the district court's conclusion that "because the facts suggest that Dreyfus, a large company, was substantially in an equal bargaining position with petitioner, it ill behooves Dreyfus to argue that it was the victim of serious economic duress in the classic legal sense."

■ Therefore, it is unnecessary to consider whether Hellenic's notations on the bill of lading were wrongful and whether any "property" was being withheld from Dreyfus. Dreyfus's final point is that deletion by Hellenic of "improper" items from the bill of lading could not constitute consideration supporting an agreement to arbitrate. However, Hellenic's promise to arbitrate was sufficient consideration to support Dreyfus's promise to arbitrate. See Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 411 (2d Cir. 1959), cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960) (consideration "supposed").

Accordingly, the judgment of the district court is affirmed.