AUSTIN INSTRUMENT, INC., Respondent, *v.* LORAL CORPORATION, Appellant.

First Department, December 17, 1970.

*Alvin A. Simon* for appellant.

*Herbert L. Ortner* of counsel (*Morris Dershowitz* with him on the brief; *Salon, Ortner, Yavers, Dershowitz & Raybin,* attorneys), for respondent.

EAGER, J. P. Following a trial before Honorable THOMAS A. AURELIO, Special Referee, the plaintiff (Austin) was awarded judgment for the full amount of the balance owing under subcontracts with defendant (Loral), including agreed upon price increases, for the manufacture and delivery of precision gear parts and assemblies used in connection with a quantity of radar dopplers which Loral had agreed to furnish for Navy use under contracts with the United States Government. Tried at the same time as Austin's action was an action brought by Loral against Austin to recover damages for alleged economic duress in the extorting of price increases for the gear parts and assemblies covered by a first subcontract. The Referee concluded that Loral had failed to establish its alleged cause of action against Austin and dismissed Loral's complaint.

Agreeing fully with the conclusions of the Referee, we affirm the judgment for the plaintiff Austin. We conclude that the findings of the Referee are fully supported by the evidence except insofar as the same may be inconsistent with the findings herein set forth.

In December of 1965, Loral had placed with Austin firm orders for the purchase of gear parts and assemblies needed for the Navy radar sets (this forming the "first subcontract" between the parties). After Austin had entered upon the performance of that subcontract, Loral was awarded an additional contract by the government for radar equipment and Austin sought to supply Loral with the machine parts to be used by Loral in performing this newly procured contract. Austin about this time demanded retroactive price increases on the items agreed to be furnished by it under the first subcontract and also demanded

that it be given the right to furnish all of the similar machine parts and assemblies which Loral needed in performing the additional Navy contract. Negotiations between the parties continued during which Loral was considering the bids submitted by Austin and others for the parts needed under the second Navy contract. Austin claimed that it was losing a substantial sum on the existing job; that it could not afford this; and that the prices being paid to it were only a fraction of what it was entitled to. Parenthetically, we may note that it is well known that in this time of continual rising of material and manufacturing costs, renegotiation of contract prices does sometimes occur in business and commercial dealings. As a matter of fact, these parties were talking and negotiating for a period of some three to four weeks concerning the performance by Austin under the first subcontract, the awarding to it of price increases covering such subcontract, and its demand that it be awarded a second subcontract to cover all the similar gears and assemblies required by Loral to fill the second Navy contract.

The talks between the parties continued until about the middle of July, 1966, and then, according to Loral's contentions, Austin actually stopped all work under the first subcontract and refused to proceed thereunder unless Loral met Austin's demands for the price increases and awarded to it a second subcontract for the additional items. As a matter of fact, however, Loral in July, 1966, did receive deliveries of machine parts covered by the first subcontract. On July 18, the vacation period of two weeks started in Austin's plant and this would normally result in a general slowdown of work and deliveries, and Loral was so advised. Although there is sufficient evidence to support a finding that Loral was then told that deliveries would be stopped, the situation was still fluid in the sense that Austin could be prevailed upon to resume normal deliveries following the vacation period.

On July 22, 1966, following the considerable negotiations between the parties and the alleged stopping of work by Austin, Loral wrote a self-serving letter to Austin noting that the latter had stopped work on the items, that Loral feared "drastic consequences" if it defaulted under the Navy contract, and that it was left "no choice or alternative but to meet your conditions". Then, some two weeks later (on August 4, 1966), Loral issued revised purchase orders binding it to the price increases for the items covered by the first subcontract and also issued to Austin purchase orders covering the items needed by Loral to fill the second Navy contract. The delivery of these purchase orders was accompanied by another self-serving letter dated

August 4. These letters of July 22 and August 4 indicate that the defendant was deliberately acting with the intent of attempting to lay the basis for an alleged cause of action for economic duress and we conclude that it was voluntarily doing so.

Loral's claim of duress, based on the foregoing facts, rests upon its contention, as alleged in its complaint, that it was "obliged to yield and capitulate" to Austin's demands because of fear of "liability for breach, default, reprocurement damages, liquidated damages and other possible legal consequences" which would result from a failure of Loral to meet the delivery requirements under the first Navy contract. As a matter of fact, however, Loral was at no time under any immediate urgency or government pressure for deliveries under the Navy contract. There had not been any default under such contract nor had Loral received any warning or notice from the government of dissatisfaction. Loral did not find it necessary to contact the government or seek any extension from it. Certainly, its "self-imposed, undisclosed, and subjective fears do not constitute an act of duress by the defendant cognizable in law." (*Joseph F. Egan, Inc.* v. *City of New York,* 17 N Y 2d 90, 98.)

Furthermore, as indicative of the fact that Loral was under no immediate pressure, it is significant that, following the negotiations between Loral and Austin and their agreement as to the price increases, Loral extended until September, 1966, the time for delivery of all but one of the remaining 23 items covered by the first subcontract. Upon a consideration of all the circumstances, we find that Loral was acting calmly and with considerable deliberation rather than because of an immediate urgency due to fear of governmental reprisals.

Under the circumstances, Austin's threat to break the first subcontract by a work stoppage does not constitute the basis for a recovery on the theory of actionable duress. "[A] threat to break a contract does not in itself constitute duress. Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate." (*Hartsville Mill* v. *United States,* 271 U. S. 43, 49, citing cases. See, also, *Doyle* v. *Rector, etc., Trinity Church,* 133 N. Y. 372, 377; *Clasen* v. *Doherty,* 242 App. Div. 502; *Halperin* v. *Wolosoff,* 282 App. Div. 876, mot. for lv. to app. den. 306 N. Y. 983.)

Accordingly, as the Special Referee put it, "a party who enters into a new agreement modifying one already existing may not disavow the new agreement for economic duress asserted to have been exercised through threat of a breach of

the original agreement, without establishing that his normal legal remedy for the breach would be inadequate or ineffectual in the situation in which he finds himself and that no other means of immediate relief is available to him (*Gallagher Switchboard Corp.* v. *Heckler Electric Co., Inc.*, 34 Misc 2d 256; s.c. on amended answer, 36 Misc 2d 225; and cases cited) ''. (See, also, *30 East End* v. *World Steel Prods. Corp.*, 110 N.Y.S. 2d 754; *Manno* v. *Mutual Health & Acc. Assn.*, 18 Misc 2d 80; *Little & Ives Co.* v. *Madison Paper Stock Co.*, 169 N. Y. S. 104; *Silliman* v. *United States*, 101 U. S. 465; *Tri-State Roofing Co. of Uniontown* v. *Simon*, 187 Pa. Super. 17; *Joyce* v. *Year Investments*, 45 Ill. App. 2d 310; *Hartsville Mill* v. *United States, supra*; Ann. 79 A. L. R. 655, 668, '' Business Compulsion ''.)

Austin was a responsible manufacturer and it was not established that its claims for retroactive price increases were made other than in good faith. If Loral really believed that Austin would run the risk of a suit for breach of contract, the proper course for Loral to have followed was to procure from others the items still deliverable by Austin under the first subcontract and thereby lay the basis for a suit for breach of that contract. If the items were so procurable, then there was no necessity to submit to Austin's price demands. But as the Referee found, '' Loral's proof does not satisfactorily establish that with reasonable effort it could not have obtained the items in question from other sources in time to meet its commitment to the Navy under the first contract. All Loral did was to make a few telephone calls to other possible sources of supply. As the trier of the facts, I find that Loral's effort to obtain the items elsewhere was neither reasonable nor commensurate with the urgency and gravity of the situation with which Loral asserts it was confronted, and, therefore, wholly insufficient to support a finding that the items were not obtainable elsewhere. Without such finding obviously there is no basis for a finding of duress.''

In the final analysis, however, the conclusion that Loral acted deliberately and voluntarily, without being under immediate pressure of incurring severe business reverses, precludes a recovery on the theory of economic duress. As Williston puts it, to make out a cause of action in economic duress, '' 1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and 2. Such act or threat must be one which deprives the victim of his unfettered will.'' (13 Williston, Contracts [3d ed.], § 1617, p. 704.)

The key element in every case is the state of mind of the person alleged to be threatened. Of course, the existence of a choice between two alternatives does not necessarily disprove the

existence of duress. The question is always one of degree and to be determined on the basis of whether there was such severe impairment of bargaining power that it may be found that the victim was precluded from exercising free will and judgment in the transaction. (See Restatement, Contracts, § 492 [1932]; *Boss* v. *Hutchinson,* 182 App. Div. 88; *Hellenic Lines Ltd.* v. *Louis Dreyfus Corp.,* 372 F. 2d 753; *Commonwealth Edison Co.* v. *Allis-Chalmers Mfg. Co.,* 245 F. Supp. 889.) But, here, as the Special Referee put it, the conclusion "becomes inescapable that Loral weighed all the considerations and determined as a matter of business judgment to continue with Austin and acted voluntarily."

Lastly, we reject as inapplicable to this case, Loral's argument based upon the general rule that the party breaching a contract has the burden of proving that his damages could have been mitigated. This was not an action to recover for breach of contract and Austin was not obliged to show that the machine parts covered by the first subcontract could have been timely purchased by Loral for less money elsewhere. Although the ability to timely procure the parts elsewhere and the price required to be paid therefor were matters properly to be considered in determining whether or not Loral acted voluntarily in acceding to Austin's demand for price increases, the relevancy of the issue does not operate to shift the burden of proof. If it was Loral's claim that it acted involuntarily in awarding the price increases because there was no alternative source of supply, it was bound to assume the burden of proving the fact. Certainly, where a contract is entered into and signed following arm's length bargaining, a party seeking to avoid it upon the ground of duress has the burden of proof. Such party must establish that the contract resulted from the influence of such fear as precluded him from the exercise of free will and judgment. Loral has not sustained the burden of proof.

The judgment in favor of the plaintiff should be affirmed, with costs.

STEUER, J. (dissenting). The facts are virtually undisputed, nor is there any serious question of law. The difficulty lies in the application of the law to these facts.

The defendant in 1965 was awarded a contract by the United States Navy for the manufacture of a number of radar sets. The sets contained almost a thousand different parts, and the defendant subcontracted the manufacture of several of these among various manufacturers. The plaintiff was awarded one of these subcontracts involving 40 different parts. Needless to remark, this was in the period of the Vietnam hostilities, and

completion of the contract was urgent. Defendant's contract with the Navy contained rigid time clauses with stiff penalties for late delivery. Defendant's procedure with regard to sub-contracts was to issue invitations to bid to manufacturers in the various fields, and this was followed.

Ten months after the award of the first contract defendant was awarded a second contract, for an additional number of sets. It followed the same procedure, circularizing manufacturers with invitations to bid. Due to the inflationary process, the net prices in defendant's second contract were substantially higher than those in the first contract, and the prices bid by plaintiff were likewise higher. Upon a review of plaintiff's performance under the first contract — especially with regard to the timeliness of deliveries — defendant concluded that it would not accept the bid for all of the parts involved but would for 23 of them. Upon receipt of this advice plaintiff presented defendant with an ultimatum to the following effect: unless defendant accepted its bid for all of the items on the second contract, and unless defendant paid for deliveries yet to be made on the first contract at the prices specified in the bid pursuant to the second contract, and unless defendant paid an additional 10% for all items already delivered on the first contract, plaintiff would stop work on that contract and would also refuse to deliver such items as were already manufactured and awaiting delivery.

Faced with this alternative, defendant contacted all the manufacturers whom it believed to be capable of making these parts. There were only a limited number, about 10. Of these all but 2 reported that they were so involved in defense contracts that they could not consider further commitments. As to the remaining 2, the best delivery time estimated for the items undelivered was 16 weeks, which, allowing time for assembly of the sets, would either involve the defendant in a default or subject it to penalties under its first contract with the Navy.

Under the circumstances, defendant agreed to plaintiff's demand, at the same time advising plaintiff in writing that it was agreeing to the terms under duress. It further appears that the excess cost under the first contract amounted to some $22,000. Defendant withheld some $17,000 under the second contract. Almost simultaneously plaintiff instituted an action for the payments not made and defendant sued for the additional sums. The actions were tried together by stipulation. The learned Special Referee gave judgment for the plaintiff.

Concededly the question is whether the established facts amount to economic duress. Not every threatened breach of a contract is to be so designated (*Doyle* v. *Rector, etc., Trinity*

*Church,* 133 N. Y. 372; *Clasen* v. *Doherty,* 242 App. Div. 502). It must in addition be shown that the ordinary remedy of suit for the breach of that contract would be inadequate and that no reasonable avenue to escape the consequences of the breach exists (*Lipin* v. *Salkin,* 6 A D 2d 785; *Underhill Constr. Corp.* v. *Ciraldo,* 24 Misc 2d 29, affd. 12 A D 2d 945; *Gallagher Switchboard Corp.* v. *Heckler Elec. Co.,* 34 Misc 2d 256, 262–263). To put it more bluntly, the choice of the lesser of two evils does not always give rise to a claim for economic duress; there must also be the factor that the choice adopted was the only one economically feasible. This was recognized by the learned Referee, who held that the defendant's proof was defective in this respect. In so finding he relied mainly on the fact that defendant in order to find a new supplier only made a few telephone calls. What was overlooked was the uncontroverted fact that those calls embraced every source known to defendant, and no additional source was suggested by anyone. Nor is the nature of the responses received in any way disputed. Nor is there any dispute as to the defendant being in serious danger of default under its contract, or as to the effect that such a default would have on its business future as a government contractor. All that is advanced is that the Navy might have reacted favorably to a request for an extension of time. Besides being merely an argument, not proof, it is too tenuous to consider. It affirmatively appears that defendant did all it could to find a substitute supplier and it was faced with a situation in which an action for breach of contract would not provide adequate relief.

The majority appears to feel that the defendant's acquiescence in the demands was motivated by a desire to have plaintiff, rather than some other contractor, as its supplier. To arrive at this conclusion, not found by the trier of the facts, it dismisses defendant's letter of protest as a device of counsel to preserve a claim while getting the advantage of plaintiff's work. But in addition it must shut its collective eyes to the ineluctable fact that what precipitated plaintiff's demands was the fact that defendant did not want plaintiff as supplier for a substantial number of items. This is exactly contrary to the theory of the majority's conclusion and belies it. Moreover, it is difficult to discover a sound basis for the solicitude for an admitted wrongdoer.

The judgment should be vacated and judgment entered for defendant on its claim.

MARKEWICH and MCNALLY, JJ., concur with EAGER, J. P.; STEUER, J., dissents in opinion in which NUNEZ, J., concurs.

Judgment, Supreme Court, New York County, entered on April 14, 1970, affirmed. Respondent shall recover of appellant $50 costs and disbursements of this appeal.