**In the Matter of the Arbitration between TRANSMARINE SEAWAYS CORP. OF MONROVIA, as Owner of the M. S. OCEAN VOYAGER, Petitioner,**

v.

**MARC RICH & CO. A. G., as Charterer, Respondent.**

**No. 79 Civ. 1439–CSH.**

United States District Court, S. D. New York.

June 15, 1979.

Healy & Baillie, New York City, for petitioner; Jack A. Greenbaum, New York City, of counsel.

Milgrim, Thomajan, Jacobs & Lee, New York City, for respondent; Robert A. Meister, Samuel D. Rosen, Robert Thomajan, New York City, of counsel.

## MEMORANDUM

HAIGHT, District Judge:

Petitioner Transmarine Seaways Corp. of Monrovia ("Transmarine") and Marc Rich & Co. A.G. ("Rich") were parties to a commercial arbitration in New York City. Transmarine was the owner of the tanker OCEAN VOYAGER. Rich chartered the vessel, in the form of a fixing telex and incorporated Exxonvoy 1969 form, to load a cargo of crude oil at a Persian Gulf port for discharge into a larger tanker, the PEGASUS, or substitute vessel. The charterparty provided for arbitration of disputes before three commercial arbitrators in New York, and an arbitration in fact took place, the panel by a 2–1 vote awarding Transmarine $52,587.16. Transmarine now moves this Court for an order confirming the award and entering judgment thereon. Rich cross-moves to vacate the award. The parties are foreign corporations. This Court's jurisdiction is founded upon the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as implemented by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201, 207.[1] For

---

1. See *Antco Shipping Co. Ltd. v. Sidermar S. p. A.*, 417 F.Supp. 207, 215 (S.D.N.Y.1976), *aff'd*, 553 F.2d 93 (2d Cir. 1977).

the reasons stated, Transmarine's motion is granted, Rich's cross-motion is denied, and judgment will be entered confirming the award.

## I.

The disputes giving rise to the arbitration are as follows. Shortly after the fixture of the vessel, Rich ordered the OCEAN VOYAGER to proceed to a designated Persian Gulf loading port, further stating in its instructions: " . . . Disport [discharge port]-Lavan Island for further orders . . ." In response to these instructions, the OCEAN VOYAGER completed loading her cargo of oil on June 9, 1977, sailing that same day for Lavan Island. The vessel arrived in the vicinity of Lavan Island, and anchored some three miles offshore at 1400 hours on June 10. Rich intended to discharge the OCEAN VOYAGER's cargo into a larger vessel, the PEGASUS. On June 15, Rich advised Transmarine that a point three-quarters of a mile off Hormuz Island was being contemplated for the transfer of the cargo. Hormuz Island is approximately 200 miles from Lavan Island, within the Persian Gulf.

On June 16, Transmarine advised Rich that it rejected Hormuz Island as the location of discharge. Transmarine called upon Rich to send the vessel and her cargo on a long voyage to various discharging ports specified in the telex fixture as alternative options to Rich as charterer.

It is not necessary to set forth the reasons Transmarine gave for refusing to proceed to Hormuz Island to rendezvous with the PEGASUS, in conformity with Rich's orders. Suffice it to say, for the purposes of this motion, that the arbitrators unanimously held that Transmarine was not within its rights in refusing to send the OCEAN VOYAGER to Hormuz Island.

Rich believed it was entitled to send the OCEAN VOYAGER to Hormuz Island to transfer her cargo to the PEGASUS. Evidence elicited before the arbitrators indicated that the PEGASUS was due to arrive off Hormuz early on Sunday, June 19, Persian Gulf time.[2] During the late afternoon of Friday, June 17, New York time, a series of transatlantic and local telephone calls and telexes began. Shortly after 4:00 p. m. George Gibson, a tanker broker in New York, was telephoned by Jack Greenbaum, a maritime lawyer in New York. Gibson had negotiated the charter of the OCEAN VOYAGER between Transmarine and Rich. Gibson negotiated the charter with Neil Forsythe, a London tanker broker with the firm of John Jacobs. Gibson was the broker for Rich, and Forsythe the broker for Transmarine. Greenbaum was counsel in New York for Transmarine. Greenbaum did not reach Gibson on the telephone, but left a message for him to return the call. When he saw the message, Gibson recognized the name of Greenbuam's law firm, and correctly inferred that Greenbaum represented Transmarine in connection with the disputes concerning discharge of the OCEAN VOYAGER's cargo. Before returning Greenbaum's call, Gibson telephoned Robert Thomajan, maritime counsel for Rich. Gibson then telephoned Greenbaum. After an inconclusive discussion of the discharge dispute, Gibson suggested that Greenbaum telephone Thomajan, so that the lawyers would be in direct contact with each other. The substance of the ensuing telephone conversations between Messrs. Greenbaum and Thomajan are discussed *post*.[3]

Gibson's next involvement came as the result of a telephone call, at about 6:30 p. m. on June 17, from one Hugh Williams, a tanker broker associated with the Jacobs firm in London. Williams, on behalf of Transmarine, passed on to Gibson a "commercial proposal," pursuant to which Transmarine would send the OCEAN VOYAGER to Hormuz Island to discharge into the PEGASUS, if Rich agreed to renegotiate the

---

**2.** Gibson, Tr. 98.

**3.** This factual account is based upon Gibson's testimony before the arbitrators and certain exhibits at the arbitration hearing. The arbitrators appear to have accepted Gibson's testimony as credible, although they drew different conclusions from it.

charter party terms, in such a way that would produce about $100,000 in additional charter party revenues for Transmarine. Gibson expressed outrage at what he regarded as blackmail, but communicated the proposal to Mr. Marc Rich, the principal officer of the Rich Company. Upon Rich's instructions, Gibson telexed a counter-proposal to Williams at about 8:00 p. m. on June 17, the counter being made "without prejudice to rights" under the original charter party.

Forsythe of Jacobs in London called Gibson at home on the morning of Saturday, June 18. There were further discussions between the two brokers about a commercial settlement, Gibson also communicating during the day with Rich and Thomajan. During a telephone conversation between Forsythe and Gibson at 4:30 p. m. on June 18, Forsythe advised that Transmarine insisted Rich give up its rights under the original charter party. Upon Rich's authority, Gibson signified agreement to Transmarine's "commercial proposal." A telex confirmation of the agreement was exchanged on Monday, June 20.

In response to the agreement entered into between the brokers on June 18, the OCEAN VOYAGER sailed from Lavan Island at 1830 hours on Sunday, June 19, bound for Hormuz Island in accordance with Rich's orders. The OCEAN VOYAGER rendezvoused with the PEGASUS off Hormuz Island on June 20, the PEGASUS having in fact arrived on June 18. Discharge of the cargo from the OCEAN VOYAGER to the PEGASUS was completed on June 22.

The June 18 agreement, memorialized in the June 20 telex, obligated Rich to pay freight and demurrage in excess of the amounts called for by the original charter party. It was made clear, during the arbitration hearing, that Rich gave first priority to getting the cargo out of the OCEAN VOYAGER and into the PEGASUS. Rich never intended to abide by the June 18 agreement. Its strategy was to obtain discharge of the cargo into the PEGASUS, and then repudiate the agreement.

Reference was made *ante* to telephone conversations between counsel on Friday, June 17. Messrs. Thomajan and Greenbaum have agreed to a summary of those conversations, and the text of that summary is set out in full:

"At 4:50 p. m., Mr. Thomajan asked Mr. Greenbaum to consent to an immediate arbitration of this dispute before a single arbitrator who would hear the matter that evening or over the weekend. Mr. Greenbaum does not recall which attorney first mentioned an immediate arbitration but does recall that it was his intention to propose an arbitration for Monday, having received authority to do so.

"Mr. Greenbaum expressed reservations about a one-man panel, but inquired as to the name of an arbitrator who would be acceptable to Charterer. Mr. Thomajan suggested a person who Mr. Greenbaum said would probably not be contractable at that time. Mr. Thomajan said he would try to reach that person and would report back.

"Mr. Thomajan then called the proposed arbitrator and ascertained that he would be available to hear a dispute that evening or over the weekend. Later that evening, Mr. Thomajan advised Mr. Greenbaum of this arbitrator's availability. Mr. Greenbaum does not recall such advice but it is possible. Mr. Greenbaum replied that he could not arbitrate that evening; he had an engagement for 7:00 p. m. which had been scheduled long previously. Moreover, Mr. Greenbaum had reservations about arbitrating on Friday or Saturday without possessing at least a telex quotation of the CP and the exchange of telexes between the parties and an opportunity to prepare legal arguments supported by precedents.

"Mr. Greenbaum recommended that since the brokers were talking directly, he would contact Mr. Thomajan the first thing Monday morning.

"Mr. Greenbaum recalls that he would have been in touch with Mr. Thomajan Monday morning but on that day he was

advised by Owner that the parties had resolved the dispute over the weekend. "In all, there were about four conversations between Mr. Greenbaum and Mr. Thomajan, the last being approximately 6:30 p. m."

Transmarine asserted claims against Rich for additional freight and demurrage, arising out of the June 18 agreement. Rich repudiated the agreement and rejected the claims. The disputes were submitted to arbitration, in accordance with the terms of the original contract. The arbitration panel consisted of an arbitrator appointed by each of the two parties, and a third arbitrator, selected by the two arbitrators so chosen. Transmarine appointed Mr. Lloyd C. Nelson as its arbitrator. Rich appointed Mr. Michael A. van Gelder. Messrs. Nelson and van Gelder selected Mr. Jack Berg as third arbitrator.

At the commencement of the hearings, Rich objected to the presence of Mr. Nelson on the panel, and demanded that he recuse himself. Rich based this demand upon the fact that Mr. Nelson was the president and chief operating officer of Orion & Global Chartering Co., Inc., the operating manager and general agents for a shipowning corporation called Andreus Compania Maritima, S.A., which had pursued a claim against Rich in arbitration and then in the federal courts. See *In the Matter of the Arbitration between Andros Compania Maritima, S.A. and Marc Rich & Co., A.G.,* 579 F.2d 691 (2d Cir. 1978). While Rich specifically disclaimed any challenge to Nelson's personal integrity, the situation arising out of the *Andros* litigation against Rich was said to disqualify Nelson because of the creation of "an appearance of bias."

Mr. Nelson declined to recuse himself. Rich sought an order from this Court disqualifying Nelson in advance of the hearings. The Court (Knapp, J.) declined to do so, on the ground that the propriety of Nelson's service on the arbitration panel could be considered only after rendition of an award.

The arbitration hearings then went forward, presenting two basic questions: (1) whether Rich was within its rights to direct the OCEAN VOYAGER to proceed from Lavan Island to Hormuz Island for discharge into the PEGASUS, as constituting the vessel's performance under the original charter party; and (2) whether the June 18 agreement, imposing additional obligations upon Rich as a consequence of the vessel's passage to Hormuz Island, was exacted under duress, and consequently unenforceable.

The arbitrators unanimously resolved the first question in favor of Rich, holding in their award:

"The Panel is of the unanimous opinion that Lavan Island was not the nominated discharge port for the transfer of the OCEAN VOYAGER cargo to the VLCC PEGASUS. Consequently, Charterer's order to the OCEAN VOYAGER that it proceed to Hormuz Island for discharge was a proper direction and in accordance with the terms and conditions of the fixture telex and the charter party incorporated therein by reference."

On the question of duress, the panel was sharply divided. The only wrongdoing Mr. Nelson could perceive was Rich's expression of consent to the agreement, while keeping its fingers crossed behind its back, and always intending to repudiate the agreement. By way of contrast, Messrs. van Gelder and Berg both condemned Transmarine roundly for repudiating its obligations under the original charter party, and taking advantage of the circumstances to exact the June 18 agreement from Rich. Berg considered that Transmarine's tactics amounted to duress in law, thereby rendering the June 18 agreement unenforceable, so that Transmarine's claims in arbitration failed. Van Gelder considered that Transmarine's actions, while commercially reprehensible, did not rise to the level of duress. Accordingly van Gelder joined with Nelson in enforcing Transmarine's claims arising out of the agreement. In consequence, the panel, by a vote of two to one, made the award in Transmarine's favor, which is the subject of these cross-motions.

## II.

■ Rich first attacks the award by reiterating its challenge to the propriety of Nelson's presence on the arbitration panel. Reliance is placed upon *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), *reh. denied*, 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969) and its progeny.

At the threshold we must consider the grounds upon which the award may be attacked. 9 U.S.C. § 207 requires the Court to confirm the award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in" the Convention. That leads us to Article V of the Convention, the full text of which appears in the margin.[4] Under Article V(2)(b), enforcement of an award may be denied if contrary to this country's public policy. The Supreme Court's elucidation of arbitral propriety in *Commonwealth Coatings* is a declaration of public policy. If Nelson's presence on the panel offended the principles declared in that case and its progeny, the award will not be enforced.

However, having crossed the threshold, it is apparent that the argument has no merit. Whatever the tensions that existed between the plurality and concurring opinions in

*Commonwealth Coatings*, see *Andros Compania Maritima, supra*, at 697, all the Justices focused upon the failure to disclose an income-producing relationship between an arbitrator and a party: namely, that the third and "supposedly neutral" arbitrator had received $12,000 in consultant's fees from the successful party. In those circumstances, the award was vacated.

Similarly, in *Miserocchi & Co., S.P.A. v. Peavey International Inc.*, 78 Civ. 1571 (S.D. N.Y. Sept. 15, 1978), also stressed by Rich, an arbitrator's company received commissions totalling $41,073.33 from one of the parties. Judge Frankel, following *Commonwealth Coatings*, vacated the award, observing in his opinion (p. 6):

> ". . . an arbitrator's receipt of income in amounts like those involved here from one of the parties to the arbitration is a matter that (1) must be disclosed and (2) is disqualifying upon objection unless waived or otherwise rendered immaterial."

The Second Circuit cases following *Commonwealth Coatings*, summarized in *Andros Compania Maritima, supra*, at 699–700, all deal with direct financial or professional relationships between an arbitrator and a party.

---

4. "1. Recognition and enforcement of the award may be refused at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

"(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

"(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

"(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

"(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

"(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

"2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

"(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

"(b) The recognition or enforcement of the award would be contrary to the public policy of that country."

No such relationship is present in the case at bar. Mr. Nelson had no financial interest in Transmarine, and neither he nor his company derived any income from Transmarine. Rich's sole complaint is that Nelson's company represented another company, which in turn asserted a claim (entirely unrelated to those at bar) against Rich. This is far too tenuous a relationship to require the disqualification of an experienced and respected maritime arbitrator,[5] particularly where Rich offers no challenge to Nelson's personal integrity.

Rich relies heavily upon the statement in *Commonwealth Coatings*, 393 U.S. at 150, 89 S.Ct. at 340, that:

"[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but must also avoid even *the appearance of bias.*"

Because it professes to perceive, in the circumstances of this case, "the appearance of bias," Rich contends that Nelson should have been disqualified without more. But there is no authority in the cases for so subjective a standard. Blemishes, like beauty, lie in the eyes of the beholder. The maritime community in New York is relatively small, and closely knit. There are not that many experienced maritime arbitrators: none whose experience exceeds that of Nelson. Commercial relationships in the industry interweave and overlap; the leaders of the industry come in constant contact with each other; on occasion disputes, arbitration, and litigation result. It would be disruptive of the resolution of maritime disputes by arbitration in this City to disqualify an arbitrator simply because a party to an arbitration proclaims, in circumstances such as these, "the appearance of bias." In the very sentence next to that relied upon by Rich, the Supreme Court in *Commonwealth Coatings* said:

"We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might *reasonably*

be thought biased against one litigant and favorable to another."

In the circumstances of this case, no one could "reasonably" conclude that Nelson was biased against Rich. His participation in the prior, unrelated litigation is far too remote; and there is a total absence of that direct financial relationship, between arbitrator and a party to the arbitration, towards which *Commonwealth Coatings* and its progeny direct their particular attention.

Nelson's presence on the arbitration panel involved no impropriety, and the award is not subject to challenge on that ground.

### III.

The question of substance is whether Transmarine exacted the June 18 agreement from Rich by duress. If that is so, the arbitration award in Transmarine's favor cannot stand. The agreement was the source of Transmarine's claims; thus enforcement of the award would constitute indirect enforcement of the agreement. *Botany Industries, Inc. v. New York Joint Board*, 375 F.Supp. 485, 491 (S.D.N.Y.1974). Agreements exacted by duress contravene the public policy of the nation, *Fluor Western, Inc. v. G. & H. Offshore Towing Co.*, 447 F.2d 35, 39 (5th Cir. 1971), and accordingly duress, if established, furnishes a basis for refusing enforcement of an award under Article V(b)(2) of the Convention. There is, of course, no substance to Transmarine's argument that the question is foreclosed from judicial review by the conclusion of a majority of the arbitrators that duress was not present, so that the contract was enforceable. When public policy is asserted as the basis for vacating an arbitration award, the court is required to make its own, independent evaluation. *Botany Industries, Inc., supra*, at 491 n. 8. We now turn to that evaluation.

Rich, alleging duress, has the burden of establishing it. That burden "is a heavy

5. According to the April, 1979 Index and Digest of the Award Service of the Society of Maritime Arbitrators, Nelson is one of the most frequently selected arbitrators, having sat on almost 200 panels. Messrs. van Gelder and Berg are also among the most frequently selected arbitrators. This was a blue-ribbon penal.

one." *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626, 634 (2d Cir. 1972). Transmarine's original breach of contract in refusing to send the OCEAN VOYAGER to Hormuz Island, while a necessary element of the charge of subsequent economic duress, does not establish it, since Rich must also "prove that further resort to legal remedies would have been impracticable or futile in the circumstances and that as a practical matter there was no other means of immediate relief available to them." *Ibid.*

■ Duress is not present unless a party is so overborne that it loses its options. "The word duress implies feebleness on one side, overpowering strength on the other." *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 300, 62 S.Ct. 581, 587, 86 L.Ed. 855 (1942). The Restatement of Contracts, § 492 (1932) characterizes duress as a wrongful act that "compels a manifestation of apparent assent by another to a transaction without his volition," or a wrongful threat "that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment." A party alleging duress must prove it had "lost capacity to exercise its judgment," so that it "had no effective freedoms of choice." *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967). Thus "the state of mind of the person threatened" is a "key element," *Hellenic Lines, supra*, at 757; duress requires "a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Plechner v. Widener College*, 418 F.Supp. 1282, 1294 (E.D.Pa.1976), and cases cited at nn. 27–29. Duress is not proven where the complaining party "merely exercised its business judgment in a difficult situation." *Hellenic Lines, supra*, at 758.

Viewed in the light of these authorities, Rich has not established duress. The claim of duress, articulated in the testimony of broker Gibson, is that Rich had committed the cargo on the OCEAN VOYAGER to the PEGASUS, and that Rich had no choice but to agree to Transmarine's terms because it

had to transfer the cargo from one vessel to the other.[6] Rich analogizes the situation to one of duress of property, such as that presented in the landmark case of *Harmony v. Bingham*, 12 N.Y. 99 (1854).

In *Harmony*, the plaintiff contracted with defendant transportation line to transport merchandise to a remote part of the country, for use in a commercial adventure in Mexico; plaintiff established that "it was essential to his interests that he should obtain possession of it immediately on its arrival." *Id.* at 112. Upon arrival, however, the defendant refused to deliver the property without the payment of a greater sum of freight than could legally be claimed. Following an unavailing protest, the plaintiff, "from the necessity of the case, and for the purpose of obtaining possession of his property," paid the illegal demand. In these circumstances, the payment was characterized as involuntary.

In *Hellenic Lines, supra*, the district court at 249 F.Supp. 526, 529 (S.D.N.Y.1966) stated the general rule as to duress of property as follows:

"... where one party has control or possession of the goods of another and refuses to surrender such goods to the owner thereof except upon the latter's compliance with an unlawful demand, a contract made by the owner to emancipate his property is considered as one made under duress and thus avoidable."

In the case at bar, Transmarine argues that it did not refuse to surrender the cargo to its lawful owner, so that no "duress of property" is involved. The argument is not wholly persuasive. By virtue of its refusal to send the OCEAN VOYAGER to Hormuz Island, Transmarine in effect refused to deliver the cargo into the PEGASUS, thereby interfering with Rich's commercial arrangements. To the extent that duress is present in this case, it arises out of Transmarine's control over the cargo in the tanks of its vessel, and its unlawful refusal to discharge the cargo in accordance with the instructions of the charterer.

Nevertheless, there is a difference between the case at bar and the situation

6. Gibson, Tr. 97, 105, 108.

presented in *Harmony v. Bingham, supra.* In *Harmony*, the plaintiff was in urgent difficulty because he required his property immediately for his own commercial use. In the case at bar, Transmarine's refusal to deliver the cargo to the waiting PEGASUS would presumably oblige Rich to pay demurrage to the owners of the PEGASUS, but no reason appears why such payments could not be claimed from Transmarine in arbitration, as the consequence of Transmarine's breach of the original charter party. I regard as fanciful Rich's suggestion, in the motion papers, that there was a risk of Transmarine making off with the cargo entirely. A shipowner whose tanker is full of someone else's oil is not entirely in the driver's seat; certain responsibilities and burdens impinge upon him as a result of the cargo's presence. By virtue of that presence, the shipowner owes a duty of care and proper custody to the cargo and its owner, whoever that owner may be. The shipowner must give consideration to the liability that would arise out of a wrongful conversion. In the case at bar, had Rich simply notified Transmarine that it insisted upon Transmarine sending the OCEAN VOYAGER to Hormuz Island and transferring the cargo into the PEGASUS, further placing Transmarine on notice of its liability for any damages resulting from a continued refusal to do so, Transmarine would have been in a commercially interesting, and far from pressure-free, situation.

Mr. van Gelder suggests that this is what Rich should have done. Mr. Berg is loathe to sanction a game of "commercial chicken." I share his sentiments, but they do not squarely address the questions posed by a claim of duress, namely, whether "further resort to legal remedies would have been impracticable or futile in the circumstances," and whether "as a practical matter there was no other means of immediate relief available." *First National Bank of Cincinnati, supra.* In the case at bar, Rich has not demonstrated its immediate, overpowering need for transfer of the cargo into the PEGASUS; nor, as a practical matter, did Transmarine hold all the commercial cards. In my judgment, Mr. van Gelder's practical suggestion as to Rich's next step in these circumstances was appropriate.

Even if the presence of the cargo on board the OCEAN VOYAGER be fully analogized to duress of property, there was available to Rich at least a possible means of immediate relief, other than capitulation to the June 18 agreement. In the conversations between counsel on Friday, June 17, the possibility of immediate arbitration, before a single arbitrator, was discussed. Prompt arbitrations are not unknown in the maritime industry; they are particularly appropriate where, as here, there is a dispute as to whether a vessel must proceed in accordance with a charterer's orders. It appears from the agreed summary of counsel's telephone conversations (355, *ante*) that both attorneys had a prompt arbitration in mind. Mr. Thomajan, on behalf of Rich, was pressing for an arbitration before a single arbitrator on Friday evening or during the weekend. Mr. Greenbaum, representing Transmarine, was not prepared to move quite so quickly, and he cannot reasonably be faulted for that position. Mr. Greenbaum does state, however, and I have no reason to doubt, that he had received authority from Transmarine to propose an arbitration on Monday, and intended to forward such a proposal to Mr. Thomajan when contacting him "the first thing Monday morning," as he promised Mr. Thomajan to do. Arbitration was mooted when the parties, acting through their brokers, negotiated the Saturday, June 18 agreement.[7]

Rich points out, correctly, that an expedited arbitration requires the willing cooperation of both parties. The Court is asked to infer that Transmarine would have withheld such cooperation. That argument was accepted by arbitrator Berg who stated in his award (p. 7) that: "There is nothing suggested in Owner's conduct which would lead me to believe that the Monday arbitration meeting would ever have come off, had not the weekend settlement agreement been made."

7. Tr. 109 110.

This statement does not take fully into account the burden of proof borne by a party seeking to avoid an agreement on the grounds of duress. It is for the party alleging duress to prove that no other source of immediate assistance was available to it. Within the context of this case, it is not for Transmarine to prove that it would have participated in an expedited arbitration; rather, Rich must prove that Transmarine would have refused to do so. There is no basis in this record for such a finding. Mr. Greenbaum, as noted, represents his authority from Transmarine to propose an arbitration for Monday. Mr. Thomajan concluded his Friday evening conversation with Mr. Greenbaum in the expectation of hearing from Mr. Greenbaum further on the subject, as a first order of business on Monday morning. We will never know if Transmarine would in fact have cooperated in an expedited arbitration on Monday, because Rich signified its consent to a commercial arrangement on the previous Saturday. Rich was at liberty to do so, but having mooted an expedited arbitration, has no basis to ask the Court to assume that Transmarine would not have participated in one.[8] The case might be different if Rich, at the cost of incurring several days' demurrage on the PEGASUS, had pressed Transmarine for an expedited arbitration, and Transmarine had declined to cooperate. But that is not this case, and resolution of the issue depends upon the facts as they are. I conclude that, in these circumstances, Rich has not and cannot establish the futility of alternative legal remedies; and that this failure is fatal to the claim of duress.[9]

This result may seem harsh, in the degree of diligence it requires of a party confronted by an unscrupulous adversary. Arbitrators van Gelder and Berg, from the heights of their vast experience in the shipping industry, condemn the actions of Transmarine, and the Court has no difficulty in agreeing with them. Rich's broker Gibson testified that, during one of his conversations with Forsythe, Transmarine's broker, the latter said of the shipowner: "Oh, he thinks he's got old Marky by the short hairs. He is going to milk it for all it's worth." The shipowner's behavior is as unattractive as the choice of words of his broker. However, the circumstances of the case do not permit, in law, a finding of duress. The law requires an exacting standard of proof from a party claiming duress, because public policy favors the enforceability of agreements ostensibly entered into by parties willing to be bound. In the case at bar, the Court is constrained to conclude that Rich has not met that burden.

IV.

The petition of Transmarine to confirm the award of arbitrators is granted, and the cross-motion of Rich to vacate the award is denied.

Settle judgment on notice.

---

8. The Court agrees with Arbitrator van Gelder's distinction between maneuver and coercion:

"It is clear to me that Owner completely outmaneuvered the Charterer, who apparently accepted Owner's statements at their face value, and allowed itself to become victimized by Owner's tactics. However, the question is not one of which party out-maneuvered the other, but as to whether it was done under duress and unlawfully."

9. See *Silliman v. U. S.*, 101 U.S. 465, 25 L.Ed. 987 (1880) for another application of this general principle to contracts of charterparty.