VIOLET ROBIE, APPELLANT

FROM DECREE OF HARRY E. WILBUR, JUDGE OF PROBATE.

Knox.    Opinion, October 5, 1945.

*Charles T. Smalley,*

*Clifford & Clifford,* for the appellant, Violet Robie.

*Z. M. Dwinal,* for the appellee, Martha J. Rankin.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MURCHIE, JJ.

HUDSON, J.    William F. Rankin, aged 73, died intestate in Camden in Knox County, State of Maine, on February 2, 1943. He left a widow, Martha J. Rankin, whom he had married on August 20, 1940, it being her third marriage and his first, and as his only heir at law his niece, Violet Robie of Hempstead, Long Island, New York, daughter of a deceased sister. Under our statute of descent the interest of the niece in the estate was one-half.

On February 17, 1943, the widow filed a petition for appointment as administratrix and was appointed on March 20, 1943. An inventory of the estate was taken which revealed property of the appraised value of $14,139.23. This was filed and accepted on September 7, 1943. On September 2, 1943, the administratrix made oath that it was a true inventory of all of the estate that had come to her possession or knowledge. On June 5, 1944, she petitioned for a widow's allowance, which was granted at the October term of the Probate Court in the sum of $3,750. Her first and final account, filed on November 2, 1944, showed a balance in her hands for distribution of

$8,679.35, all of which she claimed, one-half as widow and the other half under an assignment by the heir at law dated March 16, 1943.

The validity of this assignment is the issue in this case. Attacking it, the niece as sole heir at law brought this bill in equity in the Probate Court in Knox County (Sec. 2, Chap. 140, R. S. 1944), alleging that it was obtained by fraud and praying that it be decreed null and void for that reason. Decision in the Probate Court was for the widow. Appeal by the niece was taken to the Superior Court as Supreme Court of Probate, which court reversed the decision below, pronouncing the assignment invalid for fraud. To this ruling appeal was taken to this Court.

The fraud complained of consists of certain alleged misrepresentations of fact, chiefly in regard to the size of the estate, contained in a letter written by the widow to the niece on March 12, 1943, in which was enclosed a prepared form of assignment of the niece's interest in the estate to the widow, with a request that she "sign where the x is send it right back, please." This she did. In this letter the widow stated:

"You do that, then I'll come across not less than $500. perhaps more. I really don't know just what his estate is yet, but don't you worry I know Bill would want me to give you something the only blood relative.

Violet believe me I want to do the right thing by you, as I have done by Bill. ... I didn't know any more about Bill's business than you. .... I really don't know as there is it be very much left after everything is paid, but I won't forget you as I shall try and go back to work by the 1st June I get $20 a week. Poor Bill lost so much money in stock the 'Central Maine Power is all he has left, that is any good $400 a year coming in from that. that won't pay my rent and feed me so I am going to work."

The inventory showed that the estate consisted of rights and credits only, viz.: two savings bank deposits, one for $1,790.10 in the Waterville Savings Bank and the other for $3,000 in the Camden National Bank, besides 89 shares of preferred stock of the Central Maine Power Company valued at $8,352.75, and other stocks of differing values and some of no value, making a grand total of $14,193.23.

The niece's contention is that the letter of March 12th was intended to and did mislead and deceive her in picturing an estate very much smaller in fact than the widow knew it to be. Such misrepresentations it is claimed induced her to "sign off" for at least the sum of $500, which she would not have done had the facts as known by the widow been revealed. The letter contains no disclosure of the existence of the bank books. The widow testified that she knew of their existence when she wrote the letter, but that then she did not know how much there was in the banks. These books Mr. Rankin had kept locked in a trunk. He had been accustomed to withdraw money from the deposits and let her have it to pay hospital and doctors' bills. Upon his death she had the trunk and the keys thereto and had full opportunity and means to ascertain the amount in the two banks standing to his credit. She testified that she found these bank books "right after he passed on." He died February 2, 1943 and the letter was written March 12th thereafter. It is incredible that when she found the bank books she did not look at them and learn the amount of the deposits unless she already knew.

In the letter she stated, "I didn't know any more about Bill's business than you," but she had been doing his business to a certain extent anyway. She was his wife; no trouble existed between them; she was in a position, living with him as his wife, to know all about his business transactions (they must have been few as he had retired), while on the other hand his niece lived in New York, and she testified that her uncle never talked with her about business matters.

When the letter was written the widow was the only one upon whom the niece could rely for information as to the estate. She had a right to believe what her aunt wrote her. She had implicit faith in her honesty.

The disclosure in the letter of information in regard to the stocks and the omission to mention the bank books were well calculated to lead the niece to believe that the estate really consisted principally of the stocks. This was a material misrepresentation as to the size of the estate, intentionally made, we believe, for the very purpose of inducing the niece to sign off her interest to the widow for a nominal amount.

When she wrote in that letter, "Poor Bill lost so much money in stock the 'Central Maine Power is all he has left, that is any good $400 a year coming in from that. that won't pay my rent and feed me so I am going to work," she portrayed herself as greatly in need of what her husband left, that it was so little that she would have to go to work, and thus made a direct appeal for sympathy, when in fact she must have known of what the estate consisted and particularly in regard to the money in the banks of which she made no mention, as already stated.

In the letter she also wrote, "I really don't know as there is it be very much left after everything is paid," but her first and final account shows that the only bills against the estate, outside of the expense of administration and counsel fees, were undertaker service, nursing and board, ambulance service, hospital, and doctors' bills, totalling less than $600. It would appear that when she wrote the letter she had no knowledge in regard to bills against the estate that warranted the statement in the letter that there wouldn't be much left after everything was paid.

It must be borne in mind that the widow had possession of all the effects of the estate and so she either did know or could have known within reasonable limits of what the estate actually consisted. She also knew that she was dealing with the

heir at law in New York State who had no such means of .acquiring such information and who put her entire trust in her. When the niece was asked as to her trust or confidence in the widow she said, "Why, yes. I had no reason not to. She had seemed kind. I trusted her," and when asked, "Would you have signed this paper marked Bill of Sale if you didn't trust her?" her answer was, "Oh, no, of course not."

We quite agree with what the Justice below said in his decision, that "The defendant may not have known the exact value of the estate of her husband when she wrote the letter asking the plaintiff to 'sign where the X is'; but she did know that it was more than she then intended to inform the plaintiff, and of greater value than she wanted the plaintiff to know or to understand. The defendant deceived and intended to mislead and deceive the plaintiff."

The applicable law pertaining to the issue of fraud in this case is familiar and well established in this state. In *Gerrish, Executor* v. *Chambers et al.,* 135 Me., 70 (189 A., 187) this Court recently stated on page 74:

"Fraud in equity includes all wilful or intentional acts, omissions or concealments by which an undue or unconscientious advantage is taken over another. Undue influence is a species of constructive fraud. Whenever two persons have come into such a relation that confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is possessed by the other and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his or her position will not be permitted to retain the advantage.

"The term 'Fiduciary or confidential relation' embraces both technical fiduciary relations and those

informal relations which exist whenever one person trusts in and relies on another. And the rule is that whenever a fiduciary or confidential relation exists between the parties to a deed, gift, contract or the like, the law implies a condition of superiority held by one of the parties over the other, so that in every transaction between them by which the superior party obtains a possible benefit equity presumes the existence of undue influence and the invalidity of the transaction, and casts upon that party the burden of proof of showing affirmatively by clear evidence that he or she acted with entire fairness and the other party acted independently, with full knowledge and of his own volition free from undue influence. *Burnham* v. *Heselton,* 82 Me., 495, 500, 20 A., 80; *Eldridge* v. *May,* 129 Me., 112, 116, 150 A., 378; *Mallett* v. *Hall,* 129 Me., 148, 153, 150 A., 531."

To the same effect as to fiduciary or confidential relationship, see the more recent case of *Small, Adm'r* v. *Nelson,* 137 Me., 178, on page 182, 16 A. (2d) , 473.

Furthermore, the findings of fact in such a case as this "are not to be reversed upon appeal unless they are clearly wrong. The burden to show the error is upon the appellant." *Gerrish, Executor* v. *Chambers et al.,* supra, on page 74, and cases therein cited. The appellant has failed to sustain her burden to show error.

*Appeal dismissed.*
*Decree below affirmed.*