Richard F. **PLECHNER,** Plaintiff,

and

Alfred **Avins,** Intervenor-Plaintiff,

v.

**WIDENER COLLEGE, INC., a Pennsylvania corporation, et al., Defendants.**

Civ. A. No. 75–2862.

United States District Court,
E. D. Pennsylvania.

July 29, 1976.

Alan S. Fellheimer, Philadelphia, Pa., for plaintiff.

Alfred Avins, intervenor-plaintiff, pro se.

Franklin Poul, Judith Cohn, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

At stake in this unusual lawsuit is the control of the Delaware Law School (DLS), which was founded in 1971 by Dean Emeritus Alfred Avins (Avins), one of the plaintiffs. DLS is located in Wilmington, Delaware. The other plaintiff, Richard F. Plechner, is a DLS trustee. The legal issues before us concern the validity of the transactions in July, 1975, which resulted in the affiliation of DLS with defendant Widener College, Inc. (Widener) and in the transfer of governance of the law school from a Board of Trustees dominated by Avins to a Board, the majority of whose members were named by Widener.[1] However, the central and controlling issues are not legal but factual. Those factual issues emerge mainly from the tense and critical period in the life of DLS when accreditation of DLS by the American Bar Association (ABA) was in doubt. Unless DLS was accredited prior to the graduation of DLS' first class, the graduating students in that class would not be qualified to take bar examinations in most states. Moreover, later accreditation would not have the effect of qualifying these students. The doubt over accreditation thus presented to hundreds of students, who had committed years of study to the ambition of a career at the bar, the spectre that a significant portion of their lives might be wasted.

This thorny period was climaxed by the DLS-Widener affiliation and subsequent ABA provisional accreditation of DLS. Defendants, Widener and DLS, contend, *inter alia,* that DLS had been run by Avins as a "one-man law school," and that without the DLS-Widener affiliation there would have been no accreditation. The premise of plaintiffs' case is that the accreditation crisis was significantly fomented or fueled by actions of representatives of the defendants, with the connivance or succor of representatives of the Accreditation Committee (Committee) of the Council of the Section of Legal Education and Admissions to the Bar of the ABA (Council), and that accreditation would have followed without affiliation. The principal gravamen of plaintiffs' case is that the DLS-Widener affiliation was a product of coercion and undue influence upon the DLS trustees who voted for affiliation with Widener, or that their vote for affiliation was a product of duress. Plaintiffs also contend that the mechanism by which the affiliation was accomplished, *i. e.* the issuance by DLS, previously a non-stock corporation, of one share of stock with a par value of $1, and its

---

1. Widener is located in Pennsylvania, but it intends that DLS remain in Delaware. After affiliation DLS became known as The Delaware Law School of Widener College, Inc.

transfer to Widener for the sum of $1,[2] violates the corporation law of Delaware in that: (1) there was inadequate consideration paid for the stock since DLS had assets valued well in excess of $1; and (2) as a Delaware nonprofit corporation, DLS could not issue stock hence the issuance of the stock was *ultra vires.* The relief sought by plaintiffs is the setting aside of the DLS-Widener affiliation and the removal of the present law school trustees so that the pro- Avins trustees could resume control of the law school.

After disposing of a significant number of pre-trial matters,[3] we proceeded to a bench trial[4] at which we heard some five days of testimony. It soon appeared that the plaintiffs could not establish that the defendants or their representatives engaged in acts of coercion against or exerted undue influence over the DLS trustees who

2. Since DLS had no other outstanding shares, transfer of this single share gave Widener complete control of the school.

3. The original complaint, in which the only named plaintiff was Richard F. Plechner, a member of the New Jersey bar and one of DLS' original trustees, also alleged that the consultants to the ABA's accreditation committee were political liberals who fraudulently manipulated the inspection and accreditation process so as to delay ABA accreditation of DLS in order to eliminate the influence of the politically conservative Avins. The ABA was not named as a defendant. The action was styled as a derivative action (on behalf of DLS), and jurisdiction was founded upon diversity of citizenship. Plechner's first amended complaint repeated these allegations and augmented them to allege that the issuance of stock by DLS was "pursuant to the undue influence and direction of ABA officials," though ABA was still not named as a defendant. In his second amended complaint Plechner deleted the claims of ABA ideological bias, but added the ABA as a defendant. We then dismissed the ABA as a party defendant (on its motion) because of lack of diversity jurisdiction. We permitted Avins to intervene as a party plaintiff, pro se; he filed a complaint essentially tracking Plechner's (we note that it appeared at trial that Avins selected and paid Plechner's counsel). We have permitted Avins to act as co-counsel throughout. We vacated the previously stipulated intervention of the DLS Student Bar Association, and refused to permit intervention of several other students. We also heard and denied motions of the plaintiffs to strike various defenses and motions of both sides for summary judgment.

On the eve of trial we were presented by plaintiffs with a document called a memorandum of law which was said to be a response to our memorandum and order dated April 22, 1975, in which we concluded that plaintiffs had no right to a jury trial. *See* note 4, *infra.* Plaintiffs' memorandum suggested that we lacked jurisdiction over the subject matter which they themselves had put before us on these grounds: (1) lack of $10,000 jurisdictional amount; (2) lack of authority to affect the title to stock not situate in Pennsylvania; and (3) lack of (visitorial) power over the internal officers of a foreign corporation. Contemporaneous with the memorandum, the plaintiffs filed with the clerk under a new civil action number a new complaint, which was assigned to our docket as related to the original civil action. The only theory added by the new complaint is an allegation of (allegedly improper) transfer of funds from DLS to Widener; the apparent purposes of the new complaint are to supply an amount in controversy, and to state a damage claim, and thus to support a demand for a jury trial. The three points raised in plaintiffs' memorandum of law are without merit. As to jurisdictional amount, we note that plaintiffs have contended and also introduced evidence that funds in excess of $10,000 have been paid by DLS to Widener for administrative services. Restoration of the status quo might have required the return of these funds to DLS. The interest of DLS in these funds alone would satisfy the jurisdictional amount requirement. *See Comprehensive Group Health Services Bd. v. Temple University,* 363 F.Supp. 1069, 1094 (E.D.Pa.1973) (stake of plaintiff Board in budget appropriation for their organization satisfies jurisdictional amount requirement). As to plaintiffs' second point, it is perfectly clear that this Court has in personam jurisdiction over defendant Widener and thus has power to order it to undo the challenged transaction. See 14 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3631 at 4, 19 (1976). Plaintiffs' third point may be a valid statement of the law, but it is not applicable here, since we are asked not to regulate the internal affairs of the corporation, but to undo a transaction of the corporation involving an unrelated third party. In fact, one of plaintiffs' contentions is that this transaction resulted from the undue influence of still another third party, the American Bar Association. We are thus not required to defer to the courts of Delaware in this case.

4. In a memorandum opinion filed April 22, 1976, we struck the plaintiffs' jury demands, finding that the issues before us were equitable in nature and not the proper subject of a jury trial.

voted for merger or that they placed them under duress. What plaintiffs were advancing, it seemed to us, was what we dubbed the doctrine of "ambient coercion," *i. e.* that the atmosphere was so highly charged, that pressure from DLS students and their parents (many of whom were lawyers and judges who had intervened and taken active roles in what had become an accreditation campaign) was so great, that the DLS trustees felt compelled to vote for Widener affiliation. Of course, there is no such doctrine of "ambient coercion," but in any event, the evidence, both in its discrete portions, and in its totality, demonstrated to us beyond peradventure that the trustees were not subject to compulsion, duress, coercion or undue influence, but rather acted responsibly and voluntarily in voting for affiliation with Widener in the manner and by the means noted above.

The critical time in the quest for accreditation was the summer of 1975, when the first DLS class was about to graduate, for, as we have noted, under most state bar admission standards subsequent accreditation does not resurrect a wasted law school career. As will appear from our findings of fact, there is no doubt that but for affiliation with Widener, DLS would not have been accredited at that critical time, nor is there doubt that the trustees reasonably believed this to be so and acted accordingly. Neither, as will appear in our discussion of the applicable law, is there merit in plaintiffs' contentions as to the validity of the affiliation mechanism under Delaware corporation law. Accordingly, we will enter judgment for the defendants.

What now follows is our more detailed findings of fact as well as our conclusions of law, as required by Fed.R.Civ.P. 52(a). Because of the unique nature of the case and the importance of the matter to the parties and the DLS students, we have chronicled the relevant facts in considerable detail.

## II. *Findings of Fact*

Delaware Law School was incorporated in Delaware as a non-profit corporation on June 1, 1971. Avins, who was its incorporator and first dean, started the school to create a "haven" for conservative members of the teaching profession.[5]

By the terms of the original certificate of incorporation, the purposes of the corporation were "to establish and operate a law school in the State of Delaware" and engage in the various activities normally related to such an enterprise. The trustees or "members" had no right to any financial benefit arising out of their interest in the corporation. Upon the filing of the certificate of incorporation, the powers of the incorporator Avins terminated and were transferred to a Board of Trustees composed of Avins, Delaware State Senator Dean C. Steele, and Cornelius Milione, a Wilmington banker. The trustees had the power to dissolve the corporation and donate the assets to "another school." The corporation also reserved the right to restate or amend, alter, change or repeal any provision contained in the certificate. Finally, in contemplation of a future affiliation with a university, the certificate provided that the corporation could "merge, affiliate or contract with another non-profit educational institution under terms and conditions to be set by the Board of Trustees." Such an intention was indicated in the first catalogue of DLS.

The first students at DLS enrolled in a four-year evening program in September, 1971, with graduation set for spring of 1975.[6] Avins taught the first classes, which were held in space rented by him at the Wilmington YMCA. The only other employee of DLS at the time was a part-time librarian. During the first year Avins handled all the administrative details as well, with the assistance of only a few part-time personnel. At this time DLS had neither

---

5. We do, however, accept Avins representation that the actual course teaching at DLS has not been ideologically oriented.

6. The school's first students were obtained from lists of students rejected by other area law schools. DLS' initial capital came from a loan from Avins, who, during the early stages, also loaned DLS all of his salary, except $5,000.

degree-granting power nor accreditation from the ABA which was necessary to enable its graduates to take bar examinations in most states. Avins, however, apparently anticipated no problems in getting the necessary approvals.

By the fall of the next academic year, DLS moved to its present quarters in a former church in Wilmington which Avins had arranged for DLS to purchase by use of a purchase money mortgage. The building was in dilapidated condition, and Avins personally supervised its clean-up. At the same time, he was teaching classes and acquiring books for a library. The story of how Avins, using the help of students, revamped the physical facilities, furnished the building, and built an adequate law school library is truly astounding. We will not recount here how he (to use his own term) "scrounged;" e. g. searched out the estates of deceased lawyers and purchased books from them, obtained (at distress prices or gratis) shelving and furniture from structures about to be razed, acted as watchman for the premises, and supervised a clean up, paint up and fix up campaign, etc., but will comment only that we marvel at his resourcefulness and energy.

In the fall of 1972, DLS admitted its first full-time day students. These students also anticipated graduation in the spring of 1975. During the 1972–73 academic year, DLS hired four faculty members. Apparently as a "gimmick" to render DLS distinctive and aid its quest for accreditation, Avins imposed the requirement that a faculty member could not obtain tenure unless he had a J.S.D. or Ph.D. (law) degree. No faculty member except Avins had such a degree.[7]

During 1972 DLS attempted to obtain degree granting power. Avins initially applied to the Delaware Department of Public Instruction for such approval, but when he was unsuccessful, he sought legislation as an alternate route. Legislation was then passed which would have given DLS degree granting power if an application were made and there were no objection made by the Chief Justice of the Delaware Supreme Court, the Chancellor of Delaware, the Presiding Judge of the Superior Court, the Attorney General, the State Superintendent of Public Instruction, the President of the Delaware State Bar Association or the Chairman of the Delaware Board of Bar Examiners. However, when DLS filed its application under the statute, all but one of these persons objected.

During 1973, Avins, as the moving force behind DLS, continued to improve the physical facilities, acquire a library, and staff and obtain a faculty. The Board of Trustees was enlarged to include several of Avins' acquaintances—Dr. William Roberts, a retired Catholic University law professor; Sam Crutchfield,[8] a Washington lawyer; co-plaintiff Richard Plechner, a New Jersey lawyer; and Edward P. Scharfenberger, a New York lawyer. At the time there was no interest in the DLS from the Delaware bar. In fact, the Delaware bar was hostile to Avins.

The normal procedure for a law school to obtain provisional ABA accreditation is as follows:

The school is inspected by an ABA team which makes a report and recommendation to the Committee. The Committee in turn makes a recommendation to the Council which then makes its own recommendation. If the Council makes an affirmative recommendation of accreditation, it is reported for further action to the ABA House of Delegates. The House of Delegates then makes a final determination on whether the school will be granted provisional accreditation. In order to obtain provisional accreditation, the ABA must be satisfied that the law school will fulfill the requirements for final approval in three years. All of these procedures and the standards for accreditation are set forth in APPROVAL OF LAW SCHOOLS, *American Bar Association Standards and Rules of Procedure* (1973).

---

7. The vast majority of the tenured faculty of major law schools do not have such degrees.

8. Mr. Crutchfield resigned on June 5, 1974.

The first catalogue of DLS stated that the school would be ready for an ABA inspection by the end of the second year of operation. The second DLS catalogue represented that the school would be ready for its initial inspection in the spring of 1973. By the fall of 1973 the Board of Trustees anticipated attempting to obtain ABA approval (although DLS still did not have degree granting power). Thus, on September 15, 1973, the Board of Trustees passed a resolution calling for an inspection as soon as possible. This was consistent with the representation in the first DLS catalogue that the school would be ready for ABA inspection by the end of the second year of operation.

On January 14, 15, and 16, 1974, DLS was inspected by Dean James P. White of Indianapolis Law School (the ABA consultant on legal education) and Millard Ruud (the former ABA consultant on legal education). This inspection was the first step in the procedure for obtaining ABA accreditation. However, the report prepared and submitted by the ABA inspectors was devastating. The inspectors found fault with the physical plant, the library, the faculty, faculty salaries, the Board of Trustees, the lack of degree-granting power, the general lack of a "pursuit of excellence," and referred to DLS as a "one man law school." [9] One of the inspectors also raised the question of whether Avins' membership on the Board was consistent with the ABA standards. Accordingly, a negative recommendation on accreditation was given by the

inspectors, the Committee and the Council. This "turndown" was communicated to the students.

On May 28–30, 1974, an inspection team made up of Dean Paul W. Wildman (Southwestern Law School), Dean Jerome Prince (Brooklyn Law School), and Professor Peyton Neal (Washington & Lee Law School) conducted a second ABA inspection of DLS. Although the results of the second inspection were somewhat better than the first, the report was still highly unfavorable and was accompanied by a negative recommendation. In July, 1974, DLS was again turned down by the ABA.[10] At this time DLS still did not have degree-granting power.[11] Although a second statute was passed in Delaware in June, 1974, which would give DLS degree-granting power if there were a satisfactory report by an inspector chosen by the State Attorney General, this inspection had not taken place.[12]

As a result of the failure of DLS to obtain accreditation after two inspections and with graduation less than one year away, the students and their parents (led by those parents who were judges and lawyers) became gravely concerned and began to articulate that concern. The Student Bar Association (SBA) held various meetings to determine what to do. At one meeting in August, 1974, the students considered a resolution demanding that Avins and members of the Board of Trustees resign. Philadelphia Common Pleas Court Judge G. Fred DiBona (parent of a DLS student) prevailed on the students not to

9. Among other things, the report noted that Avins was referred to as "Mr. Secretary, Dean and Mr. Everything;" the library was not current, the Delaware bar was hostile; the budgeting process was informal; the faculty had very limited teaching experience, was underpaid and was not full-time; the physical facilities ranged "from poor to inadequate;" minutes of only one faculty meeting existed; and there was no qualified librarian.

10. The report criticized the physical facilities, the library (staff and collection), the faculty and the accounting procedures. In addition, the report severely criticized the one-man nature of the school and the lack of delegation of responsibility, as well as the poor relations

with the Delaware bar. It also commented adversely on the requirement of a J.S.D. for tenure as "unrealistic," "result[ing] in little or no tenure for almost all members of the faculty."

11. Indeed, Avins even formed a Wyoming corporation in an attempt to obtain degree-granting power.

12. Three recommendations for inspectors were to be made: one by DLS, one by students, and one by parents. The Attorney General would then select one of the three as an inspector. Dean Pasco Bowman of Wake Forest Law School, who was ultimately selected, approved the school in November, 1974.

take any action until after he attended the ABA meeting in Honolulu that month. He promised that he would try to ascertain the facts and circumstances with respect to the failure of DLS to obtain accreditation. Prior to this time Avins had told Judge DiBona that he (Avins) "was the stumbling block in the accreditation process."

At the ABA meeting, Judge DiBona spoke to members of the Committee and Council and ascertained that DLS would not receive accreditation with Avins in control. He was told *inter alia* that the faculty was below the required level, Avins could not attract faculty, the tenure requirement was unacceptable, Avins' personal conduct was under attack, and that the law school was a "one man operation."

After returning, Judge DiBona met with Avins and asked him to resign as dean to help achieve accreditation. The SBA also passed a resolution calling for the resignation of Avins as dean. Thereafter, on September 8, 1974, Avins tendered his resignation to the Board of Trustees and became dean emeritus.

Prior to his resignation Avins contacted Dean Arthur A. Weeks at the Cumberland Law School of Samford University in Birmingham, Alabama, to ask whether he would be interested in the deanship of DLS. Dean Weeks visited DLS on September 8, 1974. At the time Avins said that Weeks was "the best person to handle [the] situation," and "the best possible person in the United States to handle the Delaware Law

School." Dean Weeks accepted the position and became Dean shortly thereafter.[13]

When Dean Weeks assumed his position, he began to make as many improvements as he could, including the setting up of a record keeping and administrative system, the updating of the library and improvement of the physical facilities, to ready the school for another inspection in January, 1975. As early as October 1974, he suggested affiliation with a college or university as a means of obtaining accreditation.[14] We do not find, as Avins suggests we should, that Weeks concealed his pro-affiliation views. In November 1974, a favorable inspection by Dean Pasco Bowman of Wake Forest Law School resulted in DLS obtaining degree-granting power from Delaware.[14a]

On January 9–11, 1975, an ABA team consisting of Dean White, Dean Willard D. Lorenson (University of West Virginia Law School) and Professor Donald A. Garbrecht (University of Maine Law School) inspected DLS. Their report stated that, although there were "drastic physical changes" and "substantial improvements" since the last inspection, DLS was still not ready for accreditation.[15]

After an inspection report, a law school has the opportunity to do an update on the school and make a personal presentation to the Committee and Council. Dean Weeks, three of the trustees (Thomas S. Lodge, Charles Maddock,[16] and Richard Plechner) and various students went to Chicago in

13. On September 8, 1974, two new trustees were also added to the Board: Judge Louis Stefan, a Montgomery County, Pa. Common Pleas Judge and U.S. Senator Jesse Helms of North Carolina. Senator Helms never attended a Board of Trustees meeting and resigned in March, 1975.

14. The ABA standards state: "Affiliation between a law school and a University is desirable, but is not required for approval. If the law school is affiliated with or part of a University, that relationship shall serve to enhance the program of the law school. If the law school is an independent institution, it shall endeavor to secure the advantages that would normally result from being part of a University." Section 210.

14a. *See* note 11, *supra.*

15. In this Report the inspectors again pointed to poor relations with the Delaware bar. They pointed to specific standards, (201, 203, 209, 301, 306, 402, 501 and 701) which they felt were not complied with. Some of the main criticisms included lack of resources and long-range planning and stability.

16. Messrs. Lodge and Maddock became trustees in December, 1975. Mr. Lodge is a senior partner in one of Wilmington's largest law firms. Mr. Maddock is general counsel to Hercules, Inc.

February, 1975, to appear before the Committee and Council. Despite their presentation, DLS was again denied accreditation.[17] In connection with the official notification of the ABA action, White wrote DLS a letter outlining the various deficiencies which concerned the Council and Committee.

On the basis of information he obtained in Chicago, Dean Weeks submitted a status report to the trustees. This report recommended affiliation with a college or university (several, including Widener and the University of Delaware, were suggested) or a drastic change in the Board of Trustees as means to achieve accreditation. Shortly thereafter, discussions about affiliation were held with Widener College and the University of Delaware. Some time prior to the spring of 1975, Widener had been looking into the possibility of starting a law school. When exploring this possibility, Widener discussed DLS as a possible competitor. At the time, however, Widener knew little about DLS, except that its reputation was not good.

Widener first learned that DLS might be interested in an affiliation in late February, 1975. On March 3, 1975, Dr. Clarence Moll, Widener's president, and other representatives of Widener met with Dean Weeks and Senator Steele to discuss affiliation. Subsequent to that meeting, the Widener board voted to pursue the possibility of affiliation with DLS.[18] In March, 1975, Dr. Moll, who was not interested in affiliation with an unaccredited law school, contacted Dean White to determine the chances of accreditation of DLS if it affiliated with Widener. White said that if DLS were to merge with an established institution, accreditation would be "almost assured."

On March 23, 1975, the Board of Trustees of DLS appointed an Accreditation Committee consisting of Maddock, Lodge, Plech-ner and Roberts to look into affiliation, determine whether it was necessary for accreditation, and if so, to undertake discussions with a college or university approved by the Board of Trustees.

On April 11, 1975, Widener made a formal offer to merge with DLS. Widener's original deadline for acceptance of this offer was May 1, 1975. Prior to that date, Widener representatives met with DLS representatives, and Dr. Moll told the DLS representatives that, according to White, affiliation would materially enhance the possibility of ABA approval.

At the April 12, 1975, DLS Board of Trustees meeting, affiliation with Widener or the University of Delaware was discussed. Dr. Moll presented the position of Widener. The board voted to pursue affiliation with the University of Delaware, but if that were not successful, to accept the Widener offer.[19] Affiliation with the University of Delaware was the more logical alternative in view of its location within Delaware, whereas Widener, though geographically equidistant, was located in Pennsylvania. Mr. Maddock had pursued the University of Delaware alternative (which he strongly favored) vigorously, but in due course conceded that, given the urgency of DLS accreditation needs, the alternative was not viable in view of the cautious attitude of the University of Delaware authorities and the measured pace at which they approached the matter.

In order to reach an understanding between DLS and the ABA about the ABA's position on affiliation and accreditation, a meeting was held in the office of John Bracken, Chairman of the ABA's House of Delegates, on April 17, 1975. Dean James P. White, the ABA consultant, and various representatives of DLS, students, and parents were present. A memorandum of the meeting stated that "the future best inter-

---

17. Avins was critical of Weeks' presentation to the Committee; however, as we read plaintiffs' Reply Memorandum, Weeks' greatest sin was in even considering that the Third Inspection Report might be accurate. We reject these criticisms of Dean Weeks.

18. We find, contrary to Avins' suggestion, that there was no contact between Widener and DLS prior to late February, 1975.

19. All the trustees except Dr. Roberts were present at the April 12, 1975, meeting.

ests of the Delaware Law School lie in its affiliation with a college or university. We all agree that such affiliation would enhance accreditation." On May 2, 1975, as a result of this meeting, Widener extended the deadline for acceptance of its offer until the completion of the next ABA inspection. It was later extended until after the May 24, 1975, Board of Trustees meeting. We find that neither the deadlines imposed on its offer nor any other conduct of Widener represented an attempt to exploit the difficulties of DLS, and that Widener acted in good faith, on the basis of its own legitimate concerns with respect to the timing of affiliation, the need for accreditation and its desire for orderly planning of its programs for the fall semester.

On May 8–10, 1975, a fourth inspection of DLS was mad^ by Professor William P. Cunningham (University of Maryland Law School), Professor Roger Jacobs (University of Southern Illinois Law School) and Professor Ralph Norvell (University of South Carolina Law School). This inspection team recommended accreditation if DLS affiliated with either Widener or the University of Delaware.[20] The inspectors also said that although affiliation was not required, "there is little probability that an independent Delaware Law School could attract the broad support which is required to afford a reasonable expectation of its future stability and development without a dramatic and drastic restructuring of membership of its governing body." The results of this inspection were conveyed to Dean Weeks and some of the trustees, including Avins, at a debriefing session on the last day of the inspection. The final report was not sent until June 20, 1975.[21]

The DLS Board of Trustees met on May 24, 1975. The DLS Accreditation Committee reported its unanimous belief that affiliation with a college or university was for all practical purposes necessary for accreditation of DLS by the fall. The Committee

also reported that the University of Delaware had advised the Committee that they were not interested in affiliation with DLS. In view of the University of Delaware's position, the DLS Accreditation Committee reluctantly but unanimously recommended that DLS accept the Widener College affiliation offer. The trustees present at the meeting were Steele, Avins, Maddock, Scharfenberger, Milione and Lodge. The trustees unanimously accepted and approved the Widener offer, with Avins abstaining because he felt he had a conflict of interest because of his position as a tenured faculty member.

On June 1, 1975, a memorandum of agreement was signed by DLS and Widener. On July 8, the DLS Board of Trustees adopted and approved that agreement. Present at this meeting were Steele, Milione, Avins, Maddock, and Lodge. The vote was unanimous, with Avins abstaining and stating that he did not interpose an objection only because of the urgency of the matter.

Throughout the spring of 1975, after the DLS presentation to the ABA at its Chicago meeting, there had been tremendous agitation and concern among the students and parents at DLS. The refusal of the ABA to accredit DLS at that meeting meant that there was a serious risk that attendance at DLS for three or four years would represent an irretrievable and irreparable loss for the graduating students, an eluded career opportunity, and the veritable waste of some of the best years of their lives. Accordingly, the students and parents, through their respective organizations, the SBA and the Parents Association formed earlier, expressed great concern about the situation. They held numerous meetings among themselves and with all others who might have any input on accreditation possibilities, including Dean Weeks, and Dr. Moll of Widener College. The students and parents felt that there was little chance of

---

20. During the course of the May inspection, negotiations with the University of Delaware broke down, and it was clear that there would be no affiliation with that institution.

21. A preliminary report, not in evidence, was apparently received some time after May 24, 1975.

affiliation with the University of Delaware. They therefore lobbied strongly for affiliation with Widener. Once the Widener offer was received and they learned that the chances for accreditation after affiliation with Widener were much improved, they urged the Board of Trustees to vote for affiliation with Widener.

Although most of the expression of anxiety took the conventional forms of consultations, meetings, petitions and normal means of advocacy of their position, including the use of an attorney, a small number of students engaged in less admirable types of lobbying, including the making of nuisance phone calls to plaintiff Plechner and nonspecific threats or warnings to Avins. There was apparently also one disruption of a class when students wanted to discuss accreditation. Aside from Avins and Plechner, the only trustee bothered by any nuisance behavior was Maddock who was warned of a possible disruption at his house, which never materialized.[22]

None of the improper incidents was instituted or acquiesced in by Widener or Dean Weeks.[23] There is no evidence that any representative of Widener knew about these incidents or that Widener exerted any pressure on students, parents, faculty or trustees. Although plaintiffs claim that Dean Weeks instituted "pressure," the evidence demonstrates that from the time he first came to DLS, Weeks tried to calm and cool the students. We find that the only "pressure" towards affiliation Dean Weeks created was through his advocacy of his own opinion that the best way to obtain accreditation was through affiliation. We find that this opinion was not based on

anything other than the best interests of the students and DLS. In so finding, we reject Avins' contention that Weeks acted improperly and that he attempted to inflame the students and parents or at least to increase tension by misrepresenting the chances of accreditation with (and without) affiliation, and that Weeks (in conspiracy with Dean White) undermined the DLS Board of Trustees. We also reject Avins' contention that Dean Weeks concealed from his own board the existence of a viable "independent alternative" for DLS. There was in fact no viable independent alternative.[24]

There was no evidence before us that any trustee was "coerced" into voting for affiliation by any activities of students, parents, Dean Weeks, Widener or the ABA. Trustees Williams, Maddock, and Judge Stefan, who voted for affiliation with Widener specifically denied any coercion when called to testify by plaintiffs.[25] They testified that (and we find that) they voted for affiliation with Widener because they felt a responsibility to the students and thought that affiliation would bring about accreditation in time for the first graduation. Mr. Lodge gave the same testimony at his deposition, which was received in evidence. Mr. Plechner, who testified that he was "influenced" by student activity, did not attend any of the meetings where affiliation was voted. We find that the trustees who voted for affiliation were experienced in life and in making difficult decisions, and they were not timid or susceptible to being overwhelmed by pressure. The only real "pressure" which was imposed upon the trustees was the pressure to obtain accreditation in time to benefit the first graduating class.

> [T]here is little probability that an independent Delaware Law School could attract the broad support which is required to afford a reasonable expectation of its future stability and development without a dramatic and drastic restructuring of membership of its governing body.

**22.** Plaintiffs introduced evidence that Avins' tires were slashed or the air let out, but this behavior was not ascribed to either Weeks or Widener and was not even linked to students.

**23.** Prior to May 24, 1975, no representative of Widener addressed the students at DLS. Moreover, all contact between Dr. Moll and DLS students was at the request of the DLS students.

**24.** The relevant portion of the ABA's Fourth Inspection Report stated:

**25.** Mr. Maddock voted for affiliation with Widener at the May 24, 1975, meeting of the Board. Judge Stefan voted for it at the April 12, 1975, meeting, since he was not present on May 24.

We find that the trustees' decision to affiliate with Widener was a function of their intelligence, judgment and free will, and not of coercion, compulsion or duress.

After the memorandum of agreement between Widener and DLS was signed, accreditation was not immediate. When DLS appeared before the Accreditation Committee of the ABA in July 1975, the Committee would not recommend approval. The Council, however, did not follow the recommendation of the Committee and voted to approve DLS if the Widener affiliation was consummated before the ABA House of Delegates met in Montreal on August 7, 1975. On July 22, 1975, the DLS Board of Trustees met and voted to amend the charter and to issue one share of stock to Widener for $1.[26] The authorization of the one share of stock and its issuance to Widener, which was the principal affiliation mechanism, became effective at the Board meeting held on August 6, 1975, at which time the Board also voted to amend the bylaws to enlarge the Board to 20 members to afford Widener sufficient appointees to obtain control. Dean Weeks carried the final affiliation papers to Montreal on August 7, 1975. On August 12, 1975, the House of Delegates voted provisional approval for DLS. On August 23, 1975, the first class was graduated. DLS graduates have since taken and passed the bar examinations in various states, and some have already appeared in this court.

We note in conclusion that plaintiffs have demonstrated no wrong or injury to the corporation (DLS) as a result of affiliation. On the contrary, we find that in the absence of affiliation with Widener, DLS would have remained unaccredited. We also find that neither Plechner nor Avins has suffered any financial injury.

III. *Discussion*

### A. *Duress, Compulsion, and "Ambient Coercion"*

Plaintiffs' claims of duress are founded upon Restatement of Contracts §§ 492 and 493 and some inapposite case law. Duress is defined in § 492 as:

(a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or

(b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement.

■ This definition (which is in essence followed in most jurisdictions)[27] requires that the party claiming duress establish[28] two essential elements: (1) a wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage,[29] and (2) a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment.

26. Prior to the July 22, 1975 meeting, Mr. Lodge, a Delaware lawyer, satisfied the other trustees that the issuance and transfer of stock was valid under Delaware law.

27. *Warner-Lambert Pharmaceutical Co. v. Sylk,* 471 F.2d 1137, 1143 (3d Cir. 1972); *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.,* 372 F.2d 753, 757 (2d Cir. 1967); *Gummed Tapes (PTY) Ltd. v. Miller,* 155 F.Supp. 267, 271 (E.D. Pa.1957); *Pleuss v. City of Seattle,* 8 Wash. App. 133, 504 P.2d 1191, 1193, 1194 (1972); *People ex rel. Marcoline v. Ragen,* 132 Ill. App.2d 523, 270 N.E.2d 643, 645 (1971); *Austin Instrument, Inc. v. Loral Corp.,* 35 A.D.2d 387, 316 N.Y.S.2d 528, 533 (1970), modified, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533

(1971); *Capps v. Georgia Pacific Corp.,* 253 Or. 284, 453 P.2d 935, 939 (1969); *Dunbar v. Dunbar,* 102 Ariz. 352, 429 P.2d 949, 952, 953 (1967); *Mayor & Council v. Brookeville Turnpike Construction Co.,* 246 Md. 117, 228 A.2d 263, 287 (1967).

28. *Western Natural Gas Co. v. Cities Service Gas Co.,* 57 Del. 436, 201 A.2d 164, 169, *cert. denied,* 379 U.S. 905, 85 S.Ct. 189, 13 L.Ed.2d 177 (1964).

29. Restatement of Contracts, § 486; *W. R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896 (8th Cir. 1957), *cert. denied,* 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958).

The methods of exerting duress are set forth in the Restatement of Contracts, § 493 as follows:

(a) personal violence or a threat thereof or

(b) imprisonment, or threat of imprisonment, except where the imprisonment brought about or threatened is for the enforcement of a civil claim, and is made in good faith in accordance with law, or

(c) threats of physical injury, or of wrongful imprisonment or prosecution of a husband, wife, child or other near relative, or

(d) threats of wrongfully destroying, injuring, seizing or withholding land or other things, or

(e) any other wrongful acts that compel a person to manifest apparent assent to a transaction without his volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction.

Each of plaintiffs' trustee-witnesses—Mr. Maddock, Mr. Williams, and Judge Stefan—specifically denied that he was coerced or had his "arm twisted" into voting for affiliation with Widener. Each made a reasoned determination that affiliation was the only way to enable DLS to obtain accreditation in time to benefit the first graduating class. Mr. Williams testified that "good faith" with students required affiliation with Widener. Mr. Maddock testified that he favored affiliation with the University of Delaware and actively pursued it, but that when the University of Delaware rejected the overture, he felt the Board had made a commitment to Widener which should be honored. As Chairman of the DLS Accreditation Committee, Mr. Maddock reported that the Committee unanimously decided that the solution for accreditation was affiliation with Widener. Judge Stefan testified that if pressure from any students or parents had any effect on him, it was negative on the affiliation question. Mr. Lodge, who testified by deposition, likewise voted for affiliation because the school had been turned down three times as an independent and affiliation would go toward satisfying ABA objections to DLS' lack of long-range planning and financial responsibility.[30]

It is plain to us that the trustees who voted for affiliation acted not as the result of duress or coercion or improper conduct by the defendants or anyone with them but on the basis of their best (and reasoned) judgment that affiliation was necessary to achieve accreditation for the graduating class and was in the best interest of DLS—a judgment which was eminently reasonable.[31] We reject plaintiffs' argument that any agreement entered into in the stressful summer of 1975 is voidable.

We have also found that without affiliation DLS could not have been accredited. Under these circumstances a vote for affiliation actually fulfilled an obligation of the trustees to the DLS students. Furthermore, even if affiliation were not a guarantee to accreditation, the ABA standards treat affiliation with a university as desirable. After much debate and many conversations as to the significance of this factor, a carefully drawn memorandum of agreement expressed the position of Dean White, the ABA consultant, that "the best interests of the Delaware Law School lie in its affiliation with a college or university," and "that such affiliation would enhance accreditation." The trustees who had failed to obtain accreditation without affiliation owed it to the students to take this step so that they could truthfully say they had done everything possible to obtain accreditation. The trustees who voted for affiliation were not, in our judgment, susceptible to being overwhelmed by emotionalism. Each one of them was experienced in making difficult and significant decisions under pressure. They included an experienced

---

**30.** As Mr. Lodge stated, "[W]e certainly had nothing to lose by pursuing the matter of affiliation hoping it would help the school to get accredited, but everyone was concerned that one more turndown may be the last go-round for the Delaware Law School."

**31.** Since neither Avins nor Plechner voted for affiliation, there is therefore no real issue of coercive impact on their behavior.

bank officer (Milione), a state senator (Steele), a Common Pleas judge (Stefan), and veteran practicing lawyers (Maddock, Williams, Lodge, Scharfenberger).

■ We have found that Widener did not exercise duress or compulsion and was not aware of duress or compulsion by any other party. We also find that the activities of Dean Weeks, and more particularly, the students and parents do not constitute coercion or duress. In the first place, this theory which we have dubbed the doctrine of "ambient coercion," does not state a valid cause of action. Without the acquiescence in or knowledge of Widener of such activities, plaintiffs may not achieve a rescission of the Widener agreement. Dean Weeks was the employee and agent of DLS; it is DLS, not Widener, which is chargeable with responsibility for his conduct.[32] In any event, the conduct of Dean Weeks and the students and parents does not rise to the level of duress or unlawful compulsion cognizable in law. Plaintiffs focus on several sporadic incidents of student threats and improper conduct—nuisance letters to Plechner, "threats" to Avins, the disruption of a class. Aside from the fact that there is no proof that these incidents influenced anyone, they do not show a systematic pattern of extreme conduct such as would warrant concluding that unlawful conduct was a matter of serious concern. Rather, the incidents are consistent with and were more clearly viewed by all concerned as part of a charged and excited atmosphere when students were extremely worried about getting accreditation so that their years at DLS would not be a total waste. There is no evidence that Dean Weeks had anything to do with these miscellaneous incidents. There is no evidence of an unlawful threat or act on Dean Weeks' part. Dean Weeks favored affiliation with a college or university from the time he came to DLS and

urged this solution to the accreditation problem throughout the next year. There is no evidence that Dean Weeks held this view for any reason other than his good faith belief, based on his experience as a law school dean, that it would result in accreditation.[33]

■ Beyond these miscellaneous activities, the "pressure" complained of by plaintiffs comes down to the lobbying by students and parents for affiliation (through letters, personal pleas, and legal representations) and the threat of a lawsuit for breach of fiduciary duty if the trustees did not endorse affiliation. None of these activities constituted unlawful conduct.[34] On the contrary, they were the proper method of expression of a legitimate concern of those most drastically affected by the need for accreditation. In view of the "track record" of DLS in regard to accreditation, and the impending graduation, no one can seriously doubt that the students and parents had a legitimate and reasonable grievance against the trustees and Avins in particular. The students had waited since 1971 for accreditation. They saw DLS turned down three times by different inspectors. They were aware that affiliation was given positive consideration by the ABA (ABA Standard § 210) and more importantly that Dean White had formerly argued that it was in the "best interests" of DLS and would "enhance accreditation." Furthermore, there were no disadvantages to the students as a result of affiliation. There was thus, as Mr. Lodge put it, nothing to lose and everything to gain from affiliation. Affiliation was not even a new idea to DLS students, since the first catalogue suggested the possibility of affiliation to entering students. Indeed, the only disadvantage of affiliation suggested in the entire record is that Avins and his supporters would lose control of DLS.

---

**32.** *See* N.T. 169; *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913, 917 (1971).

**33.** We reject Avins' charge sounding in fraud or misrepresentation that Dean Weeks withheld from the Board a preliminary draft of the

Norvell inspection team which was "favorable."

**34.** *See* cases at page 1300, *infra,* holding that good faith threats of lawsuits do not constitute unlawful activity.

## B. *Undue Influence*

Plaintiffs' claims of undue influence are founded upon Restatement of Contracts §§ 496 and 497 and, again, some inapposite case law. The Restatement of Contracts, § 497 defines undue influence as follows:

Where one party is under the domination of another, or by virtue of the relationship between them is justified in assuming that the other will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable.

Clearly Widener does not hold the requisite relationship to the DLS Trustees for the concept of undue influence to apply. Plaintiffs originally alleged undue influence by the ABA but withdrew such claims. That leaves only Dean Weeks, students and parents as the possible targets of this charge. Obviously, the trustees were not under the "domination" of students and parents, and the students and parents owed no obligation to the DLS trustees. It was the DLS trustees who had an obligation to the students and parents.

The relationship between Dean Weeks and the DLS trustees—one of employer-employee—has not been treated as the type of relationship which invokes the concept of undue influence. The comments to the Restatement state: "The relationships that ordinarily fall within the rule are those of parent and child, guardian and ward, husband and wife, physician and patient, attorney and client, clergyman and parishioner." Section 497, comment a. Although other relationships may be included, undue influence is generally considered in a situation of virtual dependence or absolute trust, *e. g., Appeal of Robie,* 141 Me. 369, 44 A.2d 889 (1945); *Webber v. Phipps,* 95 N.H. 1, 56 A.2d 538 (1948). Since the Board of Trustees had the power to fire Dean Weeks, he certainly could not exercise power over the trustees. Dean Weeks was the agent of the DLS trustees, and his conduct may not be attributed to Widener. However, even assuming *arguendo* that Dean Weeks owed a fiduciary duty to the board as plaintiffs argue, he did not mislead the board or act unfairly so as to breach that duty. His conduct was completely consistent with his obligations to DLS and its students. Plaintiffs' claim of undue influence must therefore fall.

## C. *Delaware Corporation Law*

### 1. *Introduction*

To support their assertion that the mechanism by which DLS affiliated with Widener violated the Delaware Corporation Law, plaintiffs cite cases involving business corporations. DLS, however, is a nonprofit corporation, which has no shareholders with a direct pecuniary interest in it. Plaintiffs do not challenge this characterization nor could they very well do so, since a law school that is proprietary in any sense cannot be accredited.[35] Furthermore, the school was initially financed by $175,000 in prepaid tuition collected from students who were led to believe that DLS would be accredited by the time they graduated and who therefore had reason to expect that appropriate efforts were being made to achieve that goal.

The certificate of incorporation of Delaware Law School spelled out that:

EIGHTH: This corporation is not organized for pecuniary profit of its trustees or officers, nor may it issue stock or declare or distribute dividends, and no part of its net income shall inure to the benefit of any of the aforementioned persons, and any balance of money or assets remaining after full payment of corporate obligations of all kinds shall be devoted to the educational purposes of the corporation; provided, that the corporation may pay actual expenses and salaries of officers for services actually rendered to the corporation.

· · · · ·

TWELFTH: This corporation shall have the power to merge, affiliate, or contract with another non-profit educational insti-

**35.** ABA Standard 203.

tution under the terms and conditions to be set by the Board of Trustees.

These were representations on which the public—and notably the students and their parents—had a right to rely.

Tuition was being paid to a school in which the trustees (or "members") would have no pecuniary stake and which the trustees would have the power to merge or otherwise affiliate with an existing institution of higher learning, if their disinterested discretion and recognition of their fiduciary obligations made them think that this was the wisest course. What the trustees ultimately did is exactly what the charter authorized them to do—turn over control of the affairs of DLS to an existing institution of higher learning for the benefit of the students.

### 2. The Issue of Consideration

In support of its allegations that the transfer of all the stock of DLS to Widener for the sum of $1 violates the Delaware Corporation Law because of the inadequacy of consideration, plaintiffs' complaint invokes and alleges violations of §§ 152 and 153 of the Delaware Corporation Law.[36] Section 152 deals with the use and valuation of consideration other than cash. Section 153 specifies the price to be paid, and in the case of par value stock provides that:

(a) Shares of stock with par value may be issued for such consideration, *having a value not less than the par value thereof*, as is determined from time to time by the board of directors, or by the stockholders if the certificate of incorporation so provides. [Emphasis supplied]

We believe that the DLS-Widener transaction complied with the terms of this statute. The only requirement as to payment for the issuance of shares with a par value is that the amount of the par value be paid. The par value of the share received by Widener was $1, and Widener paid $1.

▮ Needless to say, strict compliance with the statute will not in all cases terminate the inquiry. Obviously, if the price represents self-dealing on the part of those in control of a corporation or other oppression of minority shareholders, then protection of the latter will be warranted. *Bennett v. Breuil Petroleum Corp.*, 34 Del.Ch. 6, 99 A.2d 236 (1953). But there is no basis for the application of such principles here. None of the minority trustees has any cognizable financial stake in the corporation. And we have found good faith on the part of the majority who authorized the issuance of the share of stock.

▮ There is no determinable "value" of the share which was issued to Widener. Widener, itself a nonprofit corporation, remains subject to the same provisions of the original DLS corporate certificate prohibiting it from realizing any financial benefit from DLS, i. e. it is impressed with the same trust. Widener cannot profit from its control of DLS or use the latter's assets except for the benefit of the school and its students, or to reimburse legitimate expenses. By affiliation Widener has assumed major responsibilities for the conduct of the law school and staked its own reputation on the future of "The Delaware Law School of Widener College, Inc." Moreover, we have found that the transaction was for the betterment of DLS. There is no relationship between the value of the assets of DLS and the "value" of a share of stock which gives Widener only the power (and duty) to administer those assets for the public benefit.[36a] Widener as "stockholder" thus has nothing more than the "old" trustees had as "members," and it cannot be contended that they should have paid for their memberships. Plaintiffs' contentions about the matter of consideration for transfer of the stock must therefore be rejected.

### 3. The Power to Issue Stock and Defense of Ultra Vires

Plaintiffs contend that as a Delaware nonprofit corporation, DLS could not issue

---

**36.** All references to sections of the Corporation Law are also references to the same sections of 8 Del. C.

**36a.** See also the discussion of "The Wishes of a Founder" at § III.C. 4, pages 1299–1300, *infra*.

stock and that the issuance of such stock was *ultra vires.* The General Corporation Law of Delaware embraces both profit and nonprofit corporations. E. Foulk, *The Delaware General Corporation Law* 6 (1972). When a power or limitation is phrased generally, it is equally applicable to profit and nonprofit corporations. When a distinction is intended, the separate treatment of the nonprofit corporation is spelled out. See, *e. g.,* §§ 102(a)(2), 255, 256, 257, 276.

The power to issue stock is given generally to "[e]very corporation." Section 151(a). The point is emphasized by § 102(a)(4) which begins with general rules about the information to be included in the certificate of incorporation with respect to the corporation's authorized stock. At the end, however, an exception is included for those nonprofit corporations which are not to have authority to issue stock:

> The foregoing provisions of this paragraph shall not apply to corporations which are not organized for profit *and* which are not to have authority to issue capital stock. *In the case of such corporations, the fact that they are not to have authority to issue capital stock shall be stated in the certificate of incorporation.* The conditions of membership of such corporations shall likewise be stated in the certificate of incorporation or the certificate may provide that the conditions of membership shall be stated in the bylaws; [Emphasis. added.]

■ We do not believe that the Delaware legislature used such language to prohibit the issuance of stock by a nonprofit corporation. Plainly such a corporation was being given the option to be a stock or non-stock corporation, and was being required only to state which it was in the certificate. If it was to have the authority to issue stock, it was bound to set forth the same information as a corporation for profit; otherwise, it was bound to state expressly that it would not have the authority to issue stock.

Moreover, § 257 (relating to the merger of domestic stock and non-stock corporations) specifically refers to the existence of nonprofit stock corporations:

> Any 1 or more non-stock corporations of this State, whether or not organized for profit, may merge or consolidate with one or more *stock* corporations of this State, *whether or not organized for profit .* . [Emphasis added.]

■ Since Delaware recognizes nonprofit stock corporations, there is no reason that DLS could not become one. As previously noted, the stock or non-stock status is a function of the certificate of incorporation. Delaware grants the broadest possible power to amend the certificate in any respect, including the authority to issue shares not previously provided for. §§ 151(g), 242. Moreover, the DLS certificate provided:

> This corporation reserves the right to restate or amend, alter, change or repeal any provision contained in its certificate of incorporation in the manner now or hereafter prescribed by law.

This reservation clearly included the right to change the provisions of the certificate with respect to non-stock status.[37]

■ It should also be noted that even if the issuance of stock *was* beyond the power of Delaware Law School, this would not justify rescinding the fundamental transaction between Delaware Law School and Widener. Delaware strictly limits the relief available in the event of an *ultra vires* transaction, and this relief does not include upsetting a consummated contract at the suit of the corporation or its shareholders. § 124.

### 4. *The Wishes of the Founder*

■ Avins has asserted some vague claims based upon his alleged rights as a "founder." However, the Delaware Corporation Law and the DLS certificate of incorporation clearly vest all the powers of the corporation in the trustees (members). The fact that Avins was the incorporator

---

**37.** We see no distinction between a "nonprofit corporation" and a "charitable corporation" for this purpose.

means nothing, since the power of an incorporator terminates when the directors (here trustees) are elected. Delaware General Corporation Law, § 107. Indeed, Article 7 of the certificate of incorporation provides:

Upon the filing of this certificate with the Secretary of State, the incorporator's powers shall terminate and the powers of the corporation shall immediately vest in a Board of Trustees as the governing body of this corporation.

Neither can Avins be considered the equivalent of the settlor of a charitable trust; DLS was a corporation whose affairs by statute and its certificate of incorporation were entrusted to the trustees. Moreover, even if DLS had been a trust, Avins would not be the "settlor." The financial contribution which got the trust going came from the students, not Avins.

The notion of the rights of a founder seems to us to be antithetical to the spirit of free inquiry and the search for knowledge which should permeate institutions of higher learning. Any ideological orientation of the school would have been an obstacle to ABA accreditation in view of ABA standards 205, 405(d), and 504. Avins' reliance on the famous case of *Trustees of Andover Theological Seminary v. Visitors of Theological Inst.*, 253 Mass. 256, 148 N.E. 900 (1925) is misplaced for there the Court relied on express limitations in original documents. The beneficiaries of DLS are (and should be) the students, and the community,[38] not the founder (Dean Emeritus Avins).

### 5. The Matter of Plaintiffs' Derivative Claims

▮ Plaintiffs have essentially brought this as a derivative action.[39] However, the purpose of a derivative action is to vindicate a wrong or injury to the corporation,

not to a particular shareholder or member. *Druckerman v. Harbord,* 174 Misc. 1077, 22 N.Y.S.2d 595, 597 (Sup.Ct.1940); 13 *W. Fletcher, Cyclopedia, Corporations,* §§ 5939, 5908 (Perm.ed.1970). Defendants have challenged plaintiffs' standing to bring the action derivatively, asserting that Plechner was a "stand-in" for Avins and that Avins is not a proper representative in a derivative action in that because of his conflict of interest he does not "fairly and adequately represent the interests of the shareholders or members similarly situated." Defendants note that plaintiffs are ultimately seeking to reverse the fundamental policy decision made by the majority of the Board of Trustees, and that this decision—to affiliate with Widener—is not and cannot be challenged as beyond the power of the Board of Trustees.

Defendants further contend that in the typical derivative action the ultimate relief sought by a minority representative is unarguably advantageous to the entity for which the representative has undertaken to act—*e. g.* a simple repayment of money to a corporation, and that in the present case, there is no unambiguously "favorable" relief that could be accorded to DLS, and there has been not even a challenge to the good faith of the majority trustees who made the policy decision which the would-be "representatives" now seek to disaffirm. A minority shareholder (or member), defendants continue, is not entitled to maintain a derivative action to attack a transaction which remains within the discretion of management. 13 *W. Fletcher, Cyclopedia, Corporations,* § 5951, at 348–49 (Perm.ed. 1970); 2 *Hornstein, Corporation Law & Practice,* § 717 (1958).

▮ In view of the allegations of plaintiffs' complaint, we believe that this case was appropriately *brought* as a derivative

---

**38.** The community's interest is at least twofold: the improvement of the legal profession and the advancement of learning.

**39.** They have no cognizable individual claims. The only injury alleged by plaintiffs individually is a diminution of their voting power. Plaintiffs, however, must take their rights from the

Certificate of Incorporation. Since the Certificate permits amendments and modification, they have no vested rights in the original Certificate of Incorporation. When the Certificate was amended to issue stock to Widener, that amendment and the attendant rights of the new shareholder to name additional trustees were binding on plaintiffs.

action. Indeed, there was no other way that Plechner and Avins could bring it. However, there has been an utter failure of proof of plaintiffs' derivative claims for they have not proved any injury to DLS resulting from affiliation. It was only as a result of affiliation that DLS acquired its most valuable asset, accreditation. Plaintiffs' individual influence is all that was diluted. There is no allegation that Widener is mismanaging DLS. Plaintiffs have offered evidence of some transfer of funds from DLS to Widener, but any assertion that this represents some kind of "looting" would be frivolous. As Dr. Moll testified, the corporate fees were paid to Widener for services actually rendered.

## IV.  *Conclusion*

If we have written too much in this opinion, if we have "carried the coals to Newcastle," it is only because the subject matter of the case—the condition and direction of a school of law, now coming of age (whose graduates are now beginning to appear before this Court and whose present students hope some day to do likewise)—seems to us to demand it. Dean Emeritus Avins and his co-plaintiff and trustee Plechner have asked us to set aside the Widener affiliation (hence, return the school to Avins' control), but for the reasons at such length articulated, the relief requested must be denied and judgment entered for the defendants.

Dean Avins is still teaching at DLS with the rank of professor. While the record does not amplify the question, from what evidence we have, it appears that Avins is a good law professor. That, having founded DLS, Avins wanted also to "own" it, and control it, or at least that he "couldn't let go" is obvious from this opinion and, institutions of higher learning being what they are, this he could not do. But though the preceding paragraph ought to have been the end of this opinion, it is not, for it would not be fitting to conclude it without adding some further observations about the efforts of Dean Emeritus Avins, upon whom the events recounted herein have cast some measure of disparagement.

First, and foremost, were it not for Alfred Avins, who came to Delaware as a sojourner in aid of a political campaign, many hundreds of young men and women (and many thousands in the years to come) would not have had the opportunity that they now will have, because of him, to practice law. It was not the pillars of the Delaware bar, or the trustees of the University of Delaware or even of Widener College who saw the need (or at least the demand) for a law school in Delaware and its environs,[40] and took the steps to found one; it was Avins. Second, unlike those who might have started a law school with the aid of considerable financial resources, or an existing educational establishment, Avins started one from nothing, out of nowhere as it were. By application of enormous resourcefulness, remarkable energy and perseverance and considerable intelligence, by acting as the proverbial "chief cook and bottle washer" and partaking of virtually augean labors, Avins single handedly built a physical plant and a library, recruited a faculty and attracted a student body, all of which added up to a viable law school. While it was not an ABA accreditable law school, and it took the efforts of Dean Weeks and Dr. Moll and many others to make it one, it was still a remarkable achievement. We do not know whether these or similar observations have been otherwise expressed in an appropriate forum; in any event, although they do not affect the result of this case, it is appropriate that they be memorialized here.

In consideration of the foregoing opinion, we enter the following order.

### ORDER

AND NOW, this 29th day of July, 1976, in consideration of the foregoing opinion, it is ORDERED that judgment be and it hereby is entered in favor of the defendants.

---

**40.** Actually, the largest geographical source of DLS students is Pennsylvania, followed by New Jersey and Delaware in that order.